ACCEPTED
15-24-00114-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/29/2025 4:59 PM
CHRISTOPHER A. PRINE
CLERK

# No. 15-24-00114-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/29/2025 4:59:42 PM
CHRISTOPHER A. PRINE
Clerk

IN THE FIFTEENTH COURT OF APPEALS

AUSTIN, TEXAS

Cecile E. Young, in her official capacity as Executive Commissioner of Texas Health & Human Services Commission, Molina Healthcare of Texas, Inc.; and Aetna Better Health of Texas, Inc.

*Appellant,*

v.

Cook Children's Health Plan, Texas Children's Health Plan, Superior HealthPlan, Inc., and Wellpoint Insurance Company,
*Appellees.*

Appeal from 455th Judicial District Court, Travis County, Texas,
Trial Court Cause No. D-1-GN-24-003839,
Hon. Laurie Eiserloh, Presiding

## APPELLANT BRIEF OF AETNA BETTER HEALTH OF TEXAS, INC.

TAFT STETTINIUS & HOLLISTER LLP
Marc J. Kessler
Admitted Pro Hac Vice
41 South High Street, Suite 1800
Columbus, Ohio 43215-6106
(614) 220-0237

EWELL, BROWN, BLANKE & KNIGHT LLP
Joseph R. Knight
State Bar No. 11601275
111 Congress Ave., Suite 2800
Austin, Texas 78701
(512) 770-4010

*Attorneys for Aetna Better Health of Texas, Inc.*

ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

The undersigned counsel of record for Appellant Aetna Better Health of Texas, Inc. ("Aetna") certifies that the following is a complete list of all parties to the judgment appealed from, along with a complete list of their respective counsel in the trial court and this Court.

*Appellant*: Cecile E. Young, in her official capacity as Executive Commissioner of Texas Health & Human Services Commission

*Trial-court Counsel*:

Thomas Bevilacqua
Jennifer Cook
Stephanie Criscione
Ali Michelle Thorburn
Rachel Behrendt
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700

*Appellate Counsel*:

Ken Paxton
Attorney General of Texas
Brent Webster
First Assistant Attorney General
William R. Peterson
Solicitor General
William F. Cole
Principal Deputy Solicitor General
Cory A. Scanlon
Assistant Solicitor General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700

*Appellant*:     Aetna Better Health of Texas, Inc.

*Trial-court and Appellate Counsel*:

Marc J. Kessler
Taft Stettinius & Hollister LLP
41 South High Street, Suite 1800
Columbus, Ohio 43215-6106
(614) 220-0237

Joseph R. Knight
Ewell, Brown, Blanke & Knight LLP
111 Congress Avenue, 28th Floor
Austin, Texas 78701
(512) 770-4010

*Appellant*:     Molina Healthcare of Texas, Inc.

*Trial-court and Appellate Counsel*:

Jason R. LaFond
Cheryl Joseph LaFond
State Bar No. 24104015
Scott, Douglass & McConnico, LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300

*Appellee*:   Cook Children's Health Plan

*Trial-court and Appellate Counsel*

Amy Warr
Anna M. Baker
Alexander Dubose & Jefferson LLP
100 Congress Avenue, Suite 1450
Austin, Texas 78701-2709
(512) 482-9300

Karen C. Burgess
Katie Dolan-Galaviz

iii

Burgess Law PC
404 West 13th Street
Austin, Texas 78701-1825
(512) 482-8808

Matthew P. Gordon
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
(206) 359.8000

*Appellee*:     Texas Children's Health Plan

*Trial-court and Appellate Counsel*

Susan Feigin Harris
Warren S. Huang
Norton Rose Fulbright US, LLP
1550 Lamar, Suite 2000
Houston, Texas 77010
(713) 651-5151

Paul Trahan
Norton Rose Fulbright US, LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
(512) 474-5201

Thomas A. Coulter
Norton Rose Fulbright US, LLP
799 9th Street, NW, Suite 1000
Washington, D.C. 20001
(202) 662-0200

Jeff J. Wurzburg
Norton Rose Fulbright US, LLP
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
(210) 224-5575

*Appellee*:     Superior HealthPlan, Inc.

*Trial-court and Appellate Counsel*

      Richard B. Phillips, Jr.
      Holland & Knight LLP
      One Arts Plaza
      1722 Routh Street, Suite 15500
      Dallas, Texas 75201
      (214) 964-9500

      Karen D. Walker
      Tiffany Roddenberry
      Holland & Knight LLP
      315 S. Calhoun Street, Suite 600
      Tallahassee, Florida 32301
      (850) 425-5612

*Appellee*:     Wellpoint Insurance Company

*Trial-court and Appellate Counsel*

      Michelle Y. Ku
      Stacy R. Obenhaus
      Foley & Lardner LLP
      2021 McKinney, Suite 1600
      Dallas, Texas 75201
      (214) 999-3000

      Robert F. Johnson III
      Foley & Lardner LLP
      600 Congress, Suite 3000
      Austin, Texas 78701
      (512) 542-7000

      Benjamin J. Grossman
      Foley & Lardner LLP
      106 E. College Ave., Suite 900
      Tallahassee, Florida 32301
      (850) 222-6100

# TABLE OF CONTENTS

Identity of Parties and Counsel ................................................................ ii

Table of Contents ................................................................................... vi

Table of Authorities ............................................................................. viii

Statement of the Case............................................................................... x

Statement Regarding Oral Argument ...................................................... xi

Issues Presented ..................................................................................... xi

Statement of Facts ................................................................................... 1

Summary of the Argument........................................................................ 6

Argument.................................................................................................. 8

    I.    The Court should dismiss this case for lack of jurisdiction because the Executive Commissioner has not yet decided Appellees' protest appeals.................................................. 8

        A.    Appellees' claims are not ripe..................................... 9

        B.    Appellees fail to show that the Executive Commissioner has engaged in any conduct outside her authority. .......................................................... 14

        C.    Even if the Executive Commissioner were to erroneously deny Appellees' appeals, she would not act *ultra vires*. .................................................. 19

    II.    Neither HHSC nor the Executive Commissioner have acted outside the discretion afforded by the procurement statutes. .............................................................................. 24

        A.    Government Code section 533.003(a)(1)................. 27

            1.    The text................................................... 28

            2.    The evidence............................................ 28

        B.    Government Code section 536.052(d)...................... 30

            1.    The text................................................... 31

            2.    The evidence............................................ 33

        C.    Government Code section 2155.144(c) and (d)(5)..... 37

            1.    The text................................................... 38

| | 2. | The evidence | 39 |
| D. | Government Code section 533.002 | | 47 |
| | 1. | The text | 47 |
| | 2. | The evidence | 48 |
| E. | Government Code section 533.004 | | 52 |
| F. | Government Code section 533.003(a)(3) | | 55 |
| | 1. | The text | 55 |
| | 2. | The evidence | 55 |
| G. | PIA disclosure of responses that Appellees redacted | | 57 |

Prayer ........................................................................................................60

Certificate of Compliance ..........................................................................61

Certificate of Service ................................................................................61

Appendix ....................................................................................................61

**Cases**

*Bridgeport Indep. Sch. Dist. v. Williams*,
447 S.W.3d 911 (Tex. App.—Austin 2014, no pet.)............................................10

*Butnaru v. Ford Motor Co.*,
84 S.W.3d 198 (Tex. 2002) .....................................................................24

*City of El Paso v. Madero Dev. & Constr. Co.*,
803 S.W.2d 396 (Tex. App.—El Paso 1991, writ denied)..................................10

*City of El Paso, v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ....................................................... 15, 24

*Hall v. McRaven*,
508 S.W.3d 232 (Tex. 2016) ........................................................ passim

*Hous. Belt & Terminal Ry. Co. v. City of Hous.*,
487 S.W.3d 154 (Tex. 2016) ....................................................................18

*Kilgore Indep. Sch. Dist. v. Axberg*,
535 S.W.3d 21 (Tex. App.—Texarkana 2017, pet. denied)...............................17

*Levandovsky v. Targa Res. Inc.*,
375 S.W.3d 593 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ....................19

*Lewis v. Jacksonville Bldg. & Loan Ass'n*,
540 S.W.2d 307 (Tex. 1976) ...................................................................19

*Mayhew v. Town of Sunnyvale*,
964 S.W.2d 922 (Tex. 1998) .....................................................................9

*Patel v. Tex. Dep't of Licensing & Regul.*,
469 S.W.3d 69 (Tex. 2015) .....................................................................15

*Patterson v. Planned Parenthood*,
971 S.W.2d 439 (Tex. 1998) ..................................................................9, 10

*Paxton v. Annunciation House, Inc.*,
No. 24-0573, 2025 WL 1536224 (Tex. May 30, 2025) ....................................14

*Perkins v. Lukens Steel Co.*,
310 U.S. 113 (1940) .............................................................................22

*State v. Hollins,*
620 S.W.3d 400 (Tex. 2020) ...............................................................24

*Sw. Elec. Power Co. v. Lynch,*
595 S.W.3d 678 (Tex. 2020) .................................................................9

*Tex. DOT v. Sefzik,*
355 S.W.3d 618 (Tex. 2011) ...............................................................17

*Tex. Highway Comm'n v. El Paso Bldg. & Const. Trades Council,*
234 S.W.2d 857 (1950)......................................................... 21, 22, 23

*United States v. Chem. Found., Inc.,*
272 U.S. 1 (1926) ................................................................................14

*Webster v. Comm'n for Law. Discipline,*
704 S.W.3d 478 (Tex. 2024) ...............................................................14

**Statutes**

1 Tex. Admin. Code § 391.307.............................................. 13, 19, 20, 47

13 Tex. Admin. Code § 1.72 ..................................................................19

Tex. Gov't Code § 2155.076..................................................................19

Tex. Gov't Code § 2155.144............................................................ 38, 46

Tex. Gov't Code § 533.002 (now Tex. Gov't Code § 540.0051)............................47

Tex. Gov't Code § 533.003(a)(1) (now Tex. Gov't Code § 540.0204(1))..............28

Tex. Gov't Code § 533.003(a)(3) (now Tex. Gov't Code § 540.0204(3))..............55

Tex. Gov't Code § 533.004 (now Tex. Gov't Code §540.0206)...........................52

Tex. Gov't Code § 536.052 (now Tex. Gov't Code § 543A.0052)........................31

Tex. Health & Safety Code § 62.055(f)...................................................53

Tex. Health & Safety Code § 62.155(c)(1)...............................................53

Tex. Local. Gov't Code § 252.061 ........................................................22

**Other Authorities**

Nichol, *Ripeness and the Constitution*, 54 U. Chi. L. Rev. 153, 178 (1987) ..........10

## STATEMENT OF THE CASE

*Nature of the Case:*

This appeal and underlying action seek injunctive and declaratory relief. The Appellees—health plans with longstanding contracts with the Appellant Texas Health and Human Services Commission ("HHSC")—have historically provided insurance coverage to enrollees in the STAR and CHIP managed care programs. Following a legislatively mandated procurement process, HHSC chose not to renew the Appellees' contracts or else offered them contracts in fewer service areas than requested. Instead, HHSC announced its intent to award new contracts to other organizations, including Aetna, whom the agency believes will better serve STAR and CHIP recipients and offer greater value to Texas taxpayers. Before the Appellees could complete their administrative protests challenging HHSC's proposed awards, they filed suit, asserting that it would be unlawful for HHSC's Executive Commissioner to proceed with the current procurement. CR8; 74; 1419; 1819.

*Trial Court:*

455th Judicial District Court, Travis County, Texas, Hon. Laurie Eiserloh, Presiding.

*Course of Proceedings*

The trial court consolidated all Appellees' suits (CR2778) and conducted a combined hearing on the Executive Commissioner's plea to the jurisdiction and Appellees' request for a temporary injunction. RR Vols 5-9.

*Trial Court's Disposition:*

At the conclusion of a week-long hearing, the trial court promptly signed a ten-page order drafted by Appellees' counsel denying the Executive Commissioner's plea to the jurisdiction and granting a sweeping injunction against the Executive Commissioner and others acting in concert with her. CR5875. The injunction broadly prohibits the enjoined parties from "signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts" relating to the procurement. *Id*.

## STATEMENT REGARDING ORAL ARGUMENT

The trial-court order has sweeping consequences for nearly every Texan—impacting millions of STAR and CHIP recipients who rely on these programs and the taxpayers who fund them. It blocks the HHSC Executive Commissioner from fulfilling her statutory duties and prevents the agency from contracting with managed care organizations that HHSC has determined will better serve Texans than the incumbent Appellees. Yet those incumbents remain in place due to judicial overreach. The volume of parties, counsel, and briefing before this Court reflects the magnitude of what's at stake. Aetna believes oral argument is essential to focus on the dispositive issues. Accordingly, Aetna respectfully urges the Court to grant argument and consider extending the allotted time to allow meaningful participation by more than one litigant per side.

## ISSUES PRESENTED

1. Are the Appellees' claims ripe for judicial determination, considering that the Executive Commissioner has not yet had the opportunity to decide Appellees' protest appeals, which present the exact arguments and seek the exact relief as this lawsuit?

2. Did the trial court err by denying the Executive Commissioner's plea to the jurisdiction because Appellees failed to show that the Executive Commissioner acted outside the bounds of a statute that affords her some, but less than absolute, discretion?

3. Did the trial court abuse its discretion by enjoining the Executive Commissioner, Aetna, Molina, and others from "signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts" resulting from a comprehensive, multi-year, legislatively mandated procurement?

This appeal arises out of a request for proposal ("RFP") issued by the Texas Health and Human Services Commission ("HHSC") on December 7, 2022. 9RR293.[1] The RFP invited managed care organizations ("MCOs") to submit bids to provide services under HHSC contracts for three healthcare programs serving low-income Texans: State of Texas Access Reform ("STAR"), Children's Health Insurance Program, and Texas Healthy Women (collectively, "CHIP"). 9RR297. HHSC planned to award at least three contracts in each of 13 service areas across the state, with initial terms of six years and an aggregate annual value of $9.7 billion. 9RR297-98, 321-22. MCOs offering the best value were eligible to receive contracts in up to seven service areas. 9RR321.

The Appellees are incumbent MCOs currently serving STAR and CHIP populations under contracts that expired years ago. 6RR142. Despite the expiration, HHSC has been forced to repeatedly extend these contracts—at a cost of hundreds of millions of dollars—because the agency cannot award new contracts until the RFP process is complete. 6RR145. HHSC's Executive Commissioner testified that although she is statutorily prohibited from extending contracts by more than one year, she has extended them in violation of the

---

[1] Citations to exhibits offered at the hearing below are by reference to the page number of the PFD file comprising the designated volume of the Reporter's Record.

appropriations rider so that STAR and CHIP participants can continue to receive the healthcare services they need. *Id*.

The RFP explicitly instructed all respondents that they "must notify [HHSC] of any ambiguity, conflict, discrepancy, exclusionary specification, omission, or other error" in the RFP before the submission deadline. 9RR303. All respondents agreed that by failing to raise any alleged problem with the RFP by the established deadline they would waive "any claim of error or ambiguity in the Solicitation and any resulting Contract." *Id*.

The RFP informed prospective bidders that their proposals "shall be evaluated in accordance with State law, including, but not limited to, applicable provisions of Chapters 533, 536, and 2155 of the Texas Government Code." 9RR313. It also stated that "HHSC shall make an award to the Respondent that, ***in HHSC's sole determination***, provides the best value to the State of Texas as set out in this Solicitation." *Id*. (emphasis added). No Appellee challenged this provision or contended that the contract awards must be based on some other criteria.

To identify which proposals provide the best value to the state, HHSC developed five Best Value Evaluation Criteria ("BVC") and then asked respondents to answer written Technical Questions and make oral presentations designed to illuminate the respondents' ability to meet each BVC. Reiterating its

2

ties to the relevant statutes, the RFP explained that "Best Value Evaluation Criteria, Technical Questions, and Oral Presentation Scenarios were developed to ensure HHSC requests the information necessary to ensure that the Respondent selected for Contract award can achieve the outcomes mandated in Texas Government Code Sections 533.002, 533.003(a)(1), 536.052, and 2155.144." 9RR317. Thus, bidders were explicitly on notice that HHSC was seeking, and their responses should provide, information relevant to these statutory directives. Not a single Appellee asserted that the RFP process was ambiguous or that its questions failed to elicit the statutory information HHSC was required to consider. As a result, any such claim is now unequivocally waived.

The RFP also explained how each answer to the Technical Questions would be scored. HHSC assembled a team of subject-matter experts to evaluate the answers, but it did not have each evaluator assign individual scores. 9RR314. Rather, HHSC planned consensus scoring meetings at which "the HHSC evaluation team will come to a consensus on the Technical Question Scores for responses to each Technical Question." 9RR314. For each respondent, HHSC developed a written "consensus scoring rubric," which set forth the exact scores each respondent received for every question and explained why. *See* 19RR and 20RR. These documents evidence precisely what HHSC considered in evaluating

3

each proposal and why HHSC assigned each proposal a particular score. *Id.* Yet the trial court refused to consider them. *See* 8RR139-57.

Eighteen MCOs submitted bids in response to the RFP, and they earned scores ranging from 1,942 to 1,562 on a 2,000-point scale. 9RR1062. On March 7, 2024, HHSC announced its intent to award contracts pursuant to the RFP. 9RR422. The four highest-scoring MCOs—Molina, Blue Cross, Aetna, and UnitedHealth—each earned contracts in seven service areas. *Id.* Appellee Wellpoint (formerly Amerigroup), as the fifth-highest scoring plan, earned contracts in six service areas. *Id.* Appellee Superior ranked seventh and was selected in three service areas. *Id.* Appellees Cook Children's and Texas Children's finished eighth and fourteenth, respectively, and consistent with their scores, earned no contracts. *Id.*

Each Appellee filed a bid protest under section 391.305 of the Texas Administrative Code, advancing the same arguments it advances in this litigation. On June 6, 2024, HHSC's Deputy Commissioner for Procurement and Contract Services ("Deputy EC") denied the protests. 9RR520; 525; 532; 540. Following the denials, each Appellee appealed to the Executive Commissioner, continuing to challenge the HHSC's procurement decisions. 6RR131; *see* 1 Tex. Admin. Code § 391.307(d).

4

Despite actively pursuing administrative protest appeals, each Appellee also filed suit against the Executive Commissioner, seeking an injunction to prevent her from deciding those very appeals. CR8; 74; 1419; 1819. The trial court consolidated the four lawsuits. CR2778. After expedited discovery, the court conducted a combined hearing on the Executive Commissioner's plea to the jurisdiction (CR2949) and Appellees' application for a preliminary injunction. *See* RR5-RR8. On the last day of the hearing, the court signed, without modification, a ten-page order drafted by Appellees' counsel. CR5875 (App 1).

In addition to denying the Executive Commissioner's plea to the jurisdiction, the trial court granted Appellees' request to prohibit the Executive Commissioner from deciding their administrative appeals. *Id*. Specifically, the court enjoined the Executive Commissioner from taking any action "to further the procurement or contracting processes for the STAR & CHIP RFP." CR5883. The court also ordered that the Executive Commissioner:

> and all other persons or entities in active concert or participation with Defendant, shall refrain from awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP.

*Id*. As a result, Appellees continue to collect hundreds of millions of taxpayer dollars under long-expired contracts, while their administrative appeals remain unresolved—judicially stalled on the Executive Commissioner's desk. Meanwhile,

5

MCOs such as Aetna, which have demonstrated the capacity to deliver superior value to the state, remain unjustly sidelined.

After this appeal commenced, HHSC and the Appellees jointly requested this Court to abate the proceedings until the 89th Legislative session concluded. Appellees evidently believed they could convince the Legislature that HHSC was acting contrary to the lawmakers' directives in connection with the RFP and its intent to award the contracts to higher-scoring MCOs such as Aetna. That effort failed. The Legislature took no action to limit the discretion it had already granted HHSC to carry out the procurement. Now, Appellees are left to argue—without legislative support—that the judiciary should override the Legislature's judgment and declare that the Executive Commissioner exceeded her statutory authority.

## SUMMARY OF THE ARGUMENT

The trial court lacked jurisdiction and should have dismissed this case outright. It had no basis grant Appellees' request for injunctive relief.

First, Appellees' claims are not ripe for judicial determination. The Texas Administrative Code affords Appellees a two-step process for resolving claims that HHSC has violated statute in connection with a procurement, which Appellees have commenced but not yet completed. They filed a protest identifying the statutes they allege HHSC has violated. After the Deputy EC denied this protest, Appellees appealed her decision to the Executive Commissioner. But their appeal

6

is still pending. By asking the judiciary to intervene before the Executive Commissioner exercises her explicit authority to decide these issues herself, Appellees seek an impermissible advisory opinion. Because Appellees have not yet suffered—and may never suffer—any harm from the violations they claim, the jurisdictional prerequisite of a ripe claim is lacking.

Second, Appellees fail to state a valid claim under the *ultra vires* doctrine. Their case is premised on the assertion that HHSC violated certain statutory mandates in connection with the RFP. But HHSC is not the defendant. The *ultra vires* doctrine does not hold the leader of a state agency vicariously liable for administrative decisions made by subordinate agency representatives. The Executive Commissioner is presumed to act lawfully, and she retains explicit statutory authority to decide the pending protest appeals—including determining whether any legal violations occurred during the procurement process. Moreover, the Executive Commissioner's express duty to decide Appellees' bid protest appeals and to take next steps based on whether she sustains or denies the appeals are future acts within her explicit grants of authority. Appellees cannot circumvent sovereign immunity by speculating that she will act unlawfully in the future. Their *ultra vires* claim therefore fails as a matter of law, and this Court should dismiss this case for lack of jurisdiction.

Third, even if Appellees' claims were ripe and legally viable, they fail on the facts. The hearing record establishes that HHSC has conducted this procurement within the bounds of the considerable discretion conferred on the agency by the statutes on which Appellees rely. The RFP plainly solicited, and the bidders plainly submitted, the very information Appellees claim was left out of the evaluation equation. And Appellees do not even attempt to show that the outcome of the procurement would have been any different if HHSC had given them the preferences or considerations that they claim (incorrectly) HHSC failed to give. These evidentiary deficiencies establish that (a) the Executive Commissioner's plea to the jurisdiction should have been sustained because she is immune from suit, and (b) Appellees' request for a temporary injunction should have been denied because they did not establish a probability of prevailing on the merits.

### ARGUMENT

**I.    The Court should dismiss this case for lack of jurisdiction because the Executive Commissioner has not yet decided Appellees' protest appeals.**

The undisputed fact that the Executive Commissioner has not yet decided Appellees' protest appeals requires dismissal for multiple related, but independent, reasons. First, Appellees' claims are not ripe for judicial determination because the injury they allege may never occur. Second, the Executive Commissioner could not possibly have acted *ultra vires* because the procurement decisions made to date have been decisions by HHSC staff members who are not defendants. The

8

Executive Commissioner's role in the procurement is her forthcoming decision on Appellees' protest appeals. Finally, even if the Executive Commissioner were to *erroneously* deny Appellees' appeals, their *ultra vires* claims would fail pursuant to the rationale of *Hall v. McRaven*, 508 S.W.3d 232, 240 (Tex. 2016), because the Executive Commissioner has absolute discretion under the Administrative Code to decide them and to determine what remedial action, if any, is appropriate.

## A. Appellees' claims are not ripe.

Ripeness is a component of subject-matter jurisdiction. *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 682 (Tex. 2020); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). Any party may raise the issue at any time, or the Court can consider it *sua sponte*. Whether a controversy is ripe for judicial determination is a pure question of law, subject to *de novo* review. *Id*. "At the time a lawsuit is filed, ripeness asks whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998).

Ripeness is a doctrine of constitutional magnitude designed to ensure that the judiciary does not issue advisory opinions. *Id*. The Texas Constitution (unlike the federal Constitution) expressly mandates separation of powers, and it authorizes only the attorney general to issue advisory opinions to the executive branch of state government. Tex. Const. art. II, § 1; art. V, § 8. A case is not ripe,

and thus calls for a constitutionally prohibited advisory opinion, "when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass." *Patterson*, 971 S.W.2d at 443.

On top of its constitutional foundation, the doctrine of ripeness is built on a pragmatic frame. *Id*. Particularly applicable here, reserving judicial power for cases that are ripe serves "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id*. (quoting *City of El Paso v. Madero Dev. & Constr. Co.*, 803 S.W.2d 396, 398-99 (Tex. App.—El Paso 1991, writ denied)); *Bridgeport Indep. Sch. Dist. v. Williams*, 447 S.W.3d 911, 917 (Tex. App.—Austin 2014, no pet.). When parties challenge administrative actions, as Appellees do here, courts scrupulously apply the ripeness doctrine to avoid intruding on the domains of the politically accountable branches of government and allow them to "perform their functions unimpeded" by judicial intervention. *Id*. (quoting Nichol, *Ripeness and the Constitution*, 54 U. Chi. L. Rev. 153, 178 (1987)).

Appellees' lawsuit is fatally defective because it rests on contingent facts, events that have not yet come to pass, and an agency decision that has not yet been formalized, much less implemented. Because the Executive Commissioner could sustain Appellees' protest appeals and award them all relief they seek in this lawsuit, the jurisdictional prerequisite of ripeness is absent. Especially considering

10

the nature of relief sought here—a judicial decree that literally prohibits an executive officer from doing her job—the courts should not interfere unless and until Appellees demonstrate that the Executive Commissioner has unlawfully caused them to suffer concrete injury.

Appellees' own pleadings negate ripeness. From their initial filings all the way through motions they have filed in this Court, Appellees have conceded that their claimed injury is based on contingent future events that may never occur—specifically that the Executive Commissioner may unlawfully deny their protest appeals and then execute contracts with the winning bidders and implement them:

- Superior pled that "[t]he proposed contract awards, if implemented, would violate multiple statutes and exceed the authority the Texas Legislature has granted to HHSC and Defendant." CR1420.

- Wellpoint pled that it will incur harm "if Defendant proceeds with the STAR & CHIP procurement process and announced intended awards." CR4278.

- Cook Children's pled "HHSC now stands ready to execute and direct the implementation of the unlawfully awarded contracts that resulted from the unlawful RFP, thereby committing ultra vires actions and causing irreparable injury to Cook Children's and the members it serves." CR13.

- Texas Children's pled that "Permitting Defendant to execute and implement the STAR and CHIP awards would result in damages to TCHP that cannot be measured with any certainty by a pecuniary standard." CR4717.

Every one of these pleadings assumes, without any factual basis, that the Executive Commissioner has no discretion to deny the pending protest appeals but will deny

11

them anyway. Consistently, when the Appellees jointly put together a chart for the trial court purporting to summarize the evidence they adduced in support of their claims, they titled it anticipatorily: "Defendant Will Act *Ultra Vires*." CR5841 (App. 2).

The speculative, contingent nature of Appellees' alleged harm continues in this Court. For example, the Children's Plans contend that "[t]he notice of intent to award contracts under HHSC's current STAR & CHIP procurement would, *if finalized and implemented*, inflict a seismic shift on the state's Medicaid landscape." M. Temp. R. at 3 (emphasis added). Superior says "*[i]f the Executive Commissioner authorizes HHSC to execute contracts based on the intended contract awards*, her action will be *ultra vires*." M. Temp. R. at 2 (emphasis added). Wellpoint argues that it "will incur irreparable harm *should the Commissioner move forward with the new contracts* or proceed further with the subject procurements." M. Temp. R. at 16 (emphasis added). *See also* Children's Plan M. Temp. R. at 18 (asserting that they aim to avoid the "possibility" of an "unacceptable result").

Yet the undisputed evidence admitted at the hearing—solicited by Appellees themselves—establishes that the Executive Commissioner has no intention of finalizing, executing, or implementing any contracts before she first considers Appellees' protest appeals. Her task in resolving the pending appeals is to decide

the exact issues on which Appellees' lawsuit is based—whether HHSC acted lawfully in the course of the procurement. This task is explicitly reserved to the Executive Commissioner in the Texas Administrative Code, but Appellees and the trial court have wrongly prevented her from performing it:

> Q: So you're not going to sign any contracts until you decide the appeals?
>
> A: That's correct.
>
> Q: And in deciding the appeal -- the appeals, you, yourself, still need to determine whether the State complied with the law --
>
> A: Yes.
>
> Q: -- in relation to this procurement?
>
> A: Yes, sir.
>
> * * *
>
> Q: If the Court denies the plaintiffs' request for an injunction, are you poised to sign the contracts?
>
> A: I would not -- I would not be ready to sign contracts until after I finish the appeals process.
>
> Q: And as part of that, you still need to determine for yourself --
>
> A: Yes, sir.
>
> Q: -- whether the State complied with the law?
>
> A: Yes, sir.

6RR132-33; *see* 1 Tex. Admin. Code, § 391.307(d)(3).

13

While Appellees speculate that the Executive Commissioner will treat their pending protest appeals as a mere formality on a predetermined path to unlawful contract awards, the judiciary must presume the opposite. Courts are bound to presume that state officials act lawfully, in good faith, and with regularity, absent clear evidence to the contrary. *See Paxton v. Annunciation House, Inc.*, No. 24-0573, 2025 WL 1536224, at *25 (Tex. May 30, 2025) (reiterating "the general rule that coordinate branches of government receive a presumption of good faith"); *Webster v. Comm'n for Law. Discipline*, 704 S.W.3d 478, 501 (Tex. 2024) (the judiciary must extend to officials of a coordinate branch of the government "a presumption of regularity, good faith, and legality") (citing ).*United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)

Appellees offered no evidence—let alone "clear" evidence—to rebut the presumption. Under well-established constitutional and prudential principles of ripeness, this Court should dismiss the case and allow the Executive Commissioner to carry out her statutory duty to resolve the protest appeals. That process may yet provide Appellees the relief they seek, eliminating any need for judicial intervention into a core executive function.

### B. Appellees fail to show that the Executive Commissioner has engaged in any conduct outside her authority.

Relatedly, because the Executive Commissioner has not yet had the opportunity to perform her duty of deciding Appellees' protest appeals, this is an

14

*ultra vires* case in name only. The Executive Commissioner is not the state official who engaged in any of the past procurement conduct of which Appellees complain, such as designing the RFP, scoring the bids, or releasing redacted versions of the proposal. Rather, Appellees have named HHSC's Executive Commissioner as a defendant simply because she is the agency's apex official.

The Supreme Court has made clear that state action cannot be controlled by naming top-ranking officials in their official capacities and complaining about decisions involving other members of the entity. *Ultra vires* suits "do not attempt to exert control over the state—they attempt to reassert the control of the state." *City of El Paso, v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). "To reassert such control, an *ultra vires* suit must lie against the 'allegedly responsible government actor in his official capacity,' not a nominal, apex representative who has nothing to do with the allegedly *ultra vires* actions." *Hall v. McRaven*, 508 S.W.3d 232, 240 (Tex. 2016) (quoting *Patel v. Tex. Dep't of Licensing & Regul.*, 469 S.W.3d 69, 76 (Tex. 2015)).

Undisputed evidence at the hearing confirmed that the Deputy EC oversees the HHSC procurement department. 5RR74. The Deputy EC and her staff conduct the procurement and then provide an action memo to the Executive Commissioner with the recommended results. 9RR411. Notably, HHSC staff "tries to avoid giving the Executive Commissioner any sort of advance notice

about the contents of a particular action memo," underscoring her lack of involvement in the procurement decisions prior to the formal recommendation relating to procurements. 6RR122-23.

If any unsuccessful bidders file a protest, the Deputy EC decides whether the protesters have demonstrated that the procurement was conducted in violation of a specific statute. 6RR131. If the Deputy EC denies the protests and any bidder appeals—as Appellees have—*then* the Executive Commissioner decides whether the agency conducted the procurement in compliance with Texas law. 6RR132; *see also* 1 Tex. Admin. Code § 391.307 (setting forth the authority of the Deputy EC to determine whether a protest establishes a statutory violation and the Executive Commissioner's authority to determine any protest appeals).

The Executive Commissioner's familiarity with the details of how the procurement has been conducted is necessarily based on what her staff has told her. 6RR135-36. And while she approved the action memo in reliance on her staff conducting the procurement according to state law, the Executive Commissioner cannot reach or render a final decision regarding the results of the procurement until she decides the protest appeals:

> Q: But you've testified that you relied on your staff
> for purposes of this procurement.
>
> A: I do.
>
> Q: So you had to trust that what they did was legal?

16

A:    Yes.

Q:    And you still haven't determined whether it is?

A:    I'm waiting on the appeals until after we get further down the line.

6RR142.

Appellees introduced no evidence that the Executive Commissioner personally made any of the decisions they characterize as unlawful or in any way acted outside the bounds of her authority. When they summarized the evidence for the trial court, Appellees tied their proof to the Executive Commissioner only by generically asserting (without evidentiary support) that "Defendant is administering the STAR & CHIP RFP in conflict with governing state law by disregarding, ignoring, or otherwise violating multiple statutory and regulatory mandates." CR5840 (App. 2). Tellingly, their lengthy bullet-point citations to the record exclusively discuss action by other HHSC employees and never mention the Executive Commissioner by name or title. *See* CR5841-55 (App. 2).

Absent pleadings and proof that the Executive Commissioner personally violated a statute, Appellees' case is a generic claim of agency misconduct, not an *ultra vires* case, and it is barred by sovereign immunity. *See generally Tex. DOT v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) ("the proper defendant in an *ultra vires* action is the state official whose acts or omissions allegedly trampled on the plaintiff's rights"); *Kilgore Indep. Sch. Dist. v. Axberg*, 535 S.W.3d 21, 30 (Tex.

17

App.—Texarkana 2017, pet. denied) (plaintiff failed to state a claim against the school district superintendent even though she was "the principal officer" of a school district accused of illegally collecting property taxes); *compare Hous. Belt & Terminal Ry. Co. v. City of Hous.*, 487 S.W.3d 154, 158 (Tex. 2016) (allowing an *ultra vires* claim to proceed against Houston's Director of Public Works and Engineering because he personally made the challenged determinations).

Every statute Appellees rely upon is directed to HHSC, not to the Executive Commissioner. The Supreme Court in *Hall* expressly rejected the notion that an apex official can be held liable on an *ultra vires* theory simply because others within the agency may have acted unlawfully. *See Hall*, 508 S.W.3d at 240 (acknowledging that a suit against a state official is another way of pleading a case against the entity of which the official is an agent, but rejecting the argument that an apex official can be liable in an *ultra vires* case for alleged violations committed by other members of the organization).

Appellees may argue that the Executive Commissioner cannot allow HHSC to conduct a procurement in violation of Texas law. But that argument fails both factually and legally. Factually, the Executive Commissioner has not yet had the opportunity to determine—through the pending protest appeals—whether her staff complied with the law. Legally, *Hall* confirms that even if an agency is acting unlawfully, its chief officer is not acting *ultra vires* so long as he personally

18

remains within the bounds of his statutory authority. Because Appellees have not identified any act by the Executive Commissioner that exceeds her lawful authority, their *ultra vires* claim fails, and this Court should dismiss it for lack of jurisdiction.

**C.     Even if the Executive Commissioner were to erroneously deny Appellees' appeals, she would not act *ultra vires*.**

The Legislature granted HHSC the express authority to develop its own rules for resolving vendor protests relating to purchasing issues, consistent with the comptroller's rules. Tex. Gov't Code § 2155.076. HHSC's rules are consistent with the comptroller's rules (*see* 13 Tex. Admin. Code § 1.72), and no one has argued otherwise. "Valid rules and regulations promulgated by an administrative agency acting within its statutory authority have the force and effect of legislation." *Lewis v. Jacksonville Bldg. & Loan Ass'n*, 540 S.W.2d 307, 310 (Tex. 1976); *Levandovsky v. Targa Res. Inc.*, 375 S.W.3d 593, 597 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (same).

These rules explicitly address the process by which HHSC determines whether a procurement has been conducted in accordance with state law. 1 Tex. Admin. Code, § 391.307. The Deputy EC decides bid protests in the first instance. 1 Tex. Admin. Code, § 391.307(a)-(c). If the Deputy EC determines that a violation has occurred before a contract has been awarded, the rules do not mandate any particular consequence; rather the Deputy EC has absolute discretion

19

to fashion "any appropriate remedial action." 1 Tex. Admin. Code, § 391.307(c)(2). Then, if a protestant appeals the Deputy EC's decision, the Executive Commissioner "will review the appeal of the Deputy Executive Commissioner of Procurement and Contracting Services' determination and render a final decision on the protest issues." 1 Tex. Admin. Code, § 391.307(d)(3).

That's it. There are no restrictions whatsoever on the manner in which the Executive Commissioner must evaluate the appeal or the criteria she must apply in determining whether the protestant has established a statutory violation. And there are no restrictions on what "appropriate remedial action," if any, must be taken if a statutory violation is found.

The Executive Commissioner is thus in the same position as Chancellor McRaven in the *Hall* case. She did not personally make the decisions that appellees allege to have violated Texas law. She is charged with deciding Appellees' bid protest appeals. And the rule granting her authority to perform this task, which has the same force and effect as a statute, affords her ***absolute*** discretion to decide the appeals and to determine appropriate remedial action, if any. *Hall*, 508 S.W.3d 242.

Even if the Executive Commissioner were to *erroneously* determine that HHSC complied with the applicable statutory mandates by imbedding the legislative requirements into the BVC, technical questions, and statements of work,

as her staff testified, she still would not be overstepping her authority. As the Supreme Court explained, "McRaven's interpretation is not of his organic authority but rather federal privacy law—a law collateral to McRaven's authority. It is Section 5.4.6 of Regents' Rule 10801, not FERPA, that supplies the parameters of McRaven's authority." *Hall*, 508 S.W.3d 242.

Here, the procurement laws cited by Appellees are likewise collateral to the Executive Commissioner's authority to decide whether HHSC is acting in compliance with them. The Executive Commissioner's authority to interpret how these laws apply to the RFP is not an interpretation of her organic authority, which comes from 1 Texas Administrative Code, section 391.307(d)(3). "When the ultimate and unrestrained objective of an official's duty is to interpret collateral law, a misinterpretation is not overstepping such authority; it is a compliant action even if ultimately erroneous." *Hall*, 508 S.W.3d 242.

That the Executive Commissioner is vested with absolute discretion to interpret and apply the procurement laws on which Appellees rely is consistent with historical views of these laws' purpose. The Texas Supreme Court long ago observed that statutory procurement directives serve as guidance to the executive branch and are "not intended to be a bestowal of litigable rights upon those desirous of selling to the Government." *Tex. Highway Comm'n v. El Paso Bldg. &*

*Const. Trades Council*, 234 S.W.2d 857, 860 (1950) (quoting *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940)).

If the Executive Commissioner erroneously determines that HHSC properly incorporated all applicable legislative preferences and considerations in conducting this procurement, she may have to answer to the governor who appointed her or to the Legislature which drafted the statutes. But *the State*, acting through the agency the Executive Commissioner leads, does not have to answer to Appellees through litigation such as this for its decision to do business with higher scoring bidders. That is why our Supreme Court, still quoting the federal Court, concluded:

> Courts have never reviewed or supervised the administration of such an executive responsibility even where executive duties "require an interpretation of the law." Judicial restraint of those who administer the Government's purchasing would constitute a break with settled judicial practice and a departure into fields hitherto wisely and happily apportioned by the genius of our policy to the administration of another branch of Government.

*Tex. Highway Comm'n*, 234 S.W.2d at 860 (quoting *Perkins*, 310 U.S. at 127).

If the Legislature had intended for courts to intervene whenever a disappointed bidder challenges a state procurement, it knows how to authorize such relief—and has done so in other contexts. For example, the Legislature has expressly permitted bidders to seek injunctive relief against municipalities that violate procurement requirements. Tex. Local. Gov't Code § 252.061. The fact

that the Legislature has not enacted analogous statutory rights for bidders on state contracts in the 75 years since *Texas Highway Commission* was decided confirms its intent for the Executive Commissioner to interpret and apply the laws in question here with absolute discretion.

Logically, Appellees cannot make their case better than Hall's by suing before the Executive Commissioner had the chance to exercise her absolute discretion to determine HHSC's compliance with state procurement law. If anything, Appellees' preemptive shot must worsen their legal position. Not only has the premature suit and erroneous trial-court order prevented the Executive Commissioner from exercising authority granted by administrative rules with statutory force, but they have usurped her discretion to fashion "any appropriate remedial action" if she were to sustain the appeals.

Rather than pursuing the administrative remedies available to them, Appellees have secured judicially mandated paralysis—blocking HHSC from executing a legislatively directed procurement of STAR and CHIP contracts. This outcome serves no one but the Appellees and undermines the Executive Commissioner's statutory role. It directly contradicts the *ultra vires* doctrine as articulated in *Hall* and nullifies the Executive Commissioner's authority under 1 Tex. Admin. Code § 391.307(d)(3) to resolve bid protests and take appropriate

action. This Court should respectfully reverse the trial court's decision and dismiss the case for lack of jurisdiction.

## II. Neither HHSC nor the Executive Commissioner have acted outside the discretion afforded by the procurement statutes.

Appellees' claims also fail on the merits. To establish jurisdiction under their *ultra vires* theory, Appellees must show that the Executive Commissioner acted without legal authority or failed to perform a purely ministerial act. *Heinrich*, 284 S.W.3d at 372. None of the acts Appellees complain about are "purely ministerial." Appellees therefore must show that the Executive Commissioner acted outside the bounds of a statute granting her some, but not absolute, discretion. *Hall*, 508 S.W.3d at 239. For the temporary injunction to stand, the record must not only establish the courts' jurisdiction (it does not) but further show that Appellees have a *probable* right to permanently enjoin the Executive Commissioner from completing this procurement. *State v. Hollins*, 620 S.W.3d 400, 405 (Tex. 2020); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).

This Appellees fail to do. The record negates both jurisdiction and the probable-right-to-relief requirements. Although Appellees convinced the trial court that HHSC inexplicably "ignored" legislative directives that it has applied in numerous other HHSC procurements for decades, their contentions and proof cannot withstand scrutiny. Appellees fail to demonstrate that the Executive

24

Commissioner or HHSC did anything but exercise the discretion granted them by Texas law. Moreover, Appellees repeatedly fail to identify any evidence that—even assuming *ultra vires* acts by the agency—such acts changed the outcome of the procurement. Appellees thus cannot demonstrate a probability of success on the merits.

The design and execution of the STAR and CHIP procurement was the result of a multi-year, transparent, and inclusive effort to improve HHSC's procurement process. *See* 9RR501-03. Beginning in 2018, HHSC reviewed its procurement processes not only with its internal staff, but with the Texas Comptroller, the State Auditor, the Office of Inspector General, and two professional external organizations. 9RR501. HHSC then synthesized recommendations from all sources in designing the procurement. *Id*.

As HHSC entered the planning phase of this procurement, it solicited input from Appellees and other members of the vendor community via pre-solicitation meetings. *Id*. HHSC then established the BVC it would use to evaluate bids and select the best proposals. *Id*. Every Appellee and other potential respondent was invited to provide input on the BVC. 9RR502. HHSC designed technical questions and oral presentation scenarios to assess and distinguish respondents' relative ability to meet the BVC. 9RR501-02.

The whole point of the BVC, technical questions, and oral presentation scenarios was to enable HHSC to apply the statutory directives that are at issue in this case in a manner that distinguished among respondents and helped identify the best bids. As the RFP states: "Best Value Evaluation Criteria, Technical Questions, and Oral Presentation Scenarios were developed to ensure HHSC requests the information necessary to ensure that the Respondent selected for Contract award can achieve the outcomes mandated in Texas Government Code Sections 533.002, 533.003(a)(1), 536.052, and 2155.144." 9RR317. The Office of Attorney General reviewed the RFP before HHSC posted it. 9RR502.

Once HHSC posted the RFP, it hosted pre-proposal meetings to provide Appellees and other potential respondents with information about the procurement and allow them to ask questions. *Id*. The RFP informed prospective bidders, and all Appellees agreed, that they "must notify [HHSC] of any ambiguity, conflict, discrepancy, exclusionary specification, omission, or other error" in the RFP before the submission deadline. 9RR303. With the exception of Wellpoint's objection to the way HHSC coupled four CHIP contracts with legislatively mandated STAR contracts, no Appellee timely raised any of the purported RFP defects it complains about today.

HHSC selected and trained a team of subject-matter experts to evaluate and score each respondent's bid. 9RR503. Rather than simply sum scores that each

26

individual evaluator may give, HHSC required them to discuss each response and come to a consensus score. *Id*. The evaluators' painstaking effort to objectively measure each response against the statutorily derived BVC is set forth in hundreds of pages of "consensus scoring rubrics." *See* 19RR and 20RR. Appellees fought hard to keep these scoring rubrics out of evidence because they demonstrate in conclusive detail HHSC's faithful application of every statute at issue. *See* 8RR139-57.

As shown below, each law that Appellees say HHSC "ignored" affords HHSC ample discretion in its application. HHSC complied with each of them in the design of the RFP and evaluation of the responses. And there is no evidence that any of them had a material effect of the outcome of the procurement. For these reasons, the trial court should have granted the Executive Commissioner's plea to the jurisdiction and, alternatively, should not have granted the request for temporary injunction. Bottom line: Appellees submitted inferior responses, confident that their status as incumbents would be all they needed to retain their status, while Aetna and others outworked and outbid them.

## A. Government Code section 533.003(a)(1)

> In awarding contracts to managed care organizations, the commission shall give preference to an organization that has significant participation in the organization's provider network from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients.

27

Tex. Gov't Code § 533.003(a)(1) (now §540.0204(1)).

### 1. The text

Section 533.003(a)(1), originally enacted in 1997, requires HHSC—not the Executive Commissioner, but the commission—to "give preference" to certain organizations in awarding contracts. The text does not provide any legislative directive on how HHSC is to apply the preference. It does not include any instruction on how "significant participation in the organization's provider network" is to be determined. It does not elucidate how the preference should be weighed against other statutory preferences in Medicaid contracting. And it does not include any documentation requirement. HHSC's discretion regarding the manner in which it gives this preference during a procurement is, therefore, absolute. *Hall*, 508 S.W.3d at 243.

### 2. The evidence

This statutory requirement served an important purpose when the state was transitioning from fee-for-service to a managed-care model for the Medicaid and CHIP programs because it helped HHSC "make sure that the health plans offer contracts in their network to any of these providers who have historically served that fee-for-service population." 7RR69. Over time, as managed care became the predominant model statewide, HHSC implemented rules to ensure that providers traditionally serving Medicaid and charity populations become members of *all*

28

plans' networks. According to the State Medicaid Director's undisputed testimony:

> Health plans have to contract with Medicaid enrolled providers. They enroll with the State first, then they can be in a health plan network. So to say that -- you know, any -- ***any health plan with a network is going to by default have providers in it that have served Medicaid and charity care patients because those are who the Medicaid providers are***.

*Id*. (emphasis added).

After requiring providers who have traditionally provided care to Medicaid and charity care patients providers to enroll with the State, HHSC then requires that every contracted MCO "must enter into a provider contract with any willing provider, meaning any of these provider types listed [in the statute] who will enter into a contract with them, they have to accept it." 7RR70; *see* 12RR701 (SOW 2.6.36.25). Accordingly, "every, you know, plan in this program is required to have those Medicaid and indigent care providers in their network if that provider will accept the contract." 7RR71. Therefore, as the Medicaid Director explained without contradiction:

> the requirement about Medicaid and indigent care providers being in a network ***doesn't distinguish plans between each other*** because any plan with a network which they would describe in their response would by default have a network of Medicaid providers and charity care providers because that's who the Medicaid providers are. They cannot pluck a doctor who's not enrolled in Medicaid out of an area and put them in their network.

29

> The doctors have to already been enrolled in Medicaid.
> So therefore, they have a network of Medicaid providers.

7RR72-73 (emphasis added). The statutory preference is "just not a distinguishing factor amongst plans." 7RR69. HHSC can hardly act *ultra vires* in applying a preference for which every bidder qualifies.

Even if this preference retained practical significance, Appellees introduced no evidence that HHSC's alleged failure to comply with section 533.003(a)(1) made any difference in the result of the procurement. No Appellee offered testimony that its particular network, in fact, featured "significant participation . . . from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients." No Appellee introduced evidence comparing its network to that of a successful bidder in any service area the losing bidder sought. And no Appellee showed how its score would have surpassed a relevant successful bidder's score if only HHSC had awarded the Appellee a preference for its provider network.

### B.    Government Code section 536.052(d)

(a) The commission may allow a managed care organization participating in the child health plan program or Medicaid increased flexibility to implement quality initiatives in a managed care plan offered by the organization, including flexibility with respect to financial arrangements, to:

(1) achieve high-quality, cost-effective health care;

(2) increase the use of high-quality, cost-effective

delivery models;

(3) reduce the incidence of unnecessary institutionalization and potentially preventable events; and

(4) in collaboration with physicians and other health care providers, increase the use of alternative payment systems, including shared savings models.

(b) The commission shall develop quality-of-care and cost-efficiency benchmarks, including benchmarks based on a managed care organization's performance with respect to:

(1) reducing potentially preventable events; and

(2) containing the growth rate of health care costs.

\* \* \*

(d) In awarding contracts to managed care organizations under the child health plan program and Medicaid, the commission shall, in addition to considerations under Section 540.0204 of this code and Section 62.155, Health and Safety Code, give preference to an organization that offers a managed care plan that:

(1) successfully implements quality initiatives under Subsection (a) as the commission determines based on data or other evidence the organization provides; or

(2) meets quality-of-care and cost-efficiency benchmarks under Subsection (b).

Tex. Gov't Code § 536.052 (now § 543A.0052).

## 1. The text

Government Code section 536.052(d) concerns quality initiatives and certain benchmarks. Subsection (a) allows MCOs financial flexibility to implement

31

quality initiatives. Subsection (b) directs HHSC to develop quality-of-care and cost-efficiency benchmarks; but the statute does not establish a deadline by which these benchmarks must be developed, and the evidence showed that they were not utilized in connection with this procurement. Appellees rely on subsection (d), which provides that HHSC—not the Executive Commissioner, but the commission—shall give a preference in awarding MCO contracts to an organization that "successfully implements quality initiatives under Subsection (a) as the commission determines based on data or other evidence the organization provides."

The statutory text affords HHSC unconstrained discretion to "determine" whether an organization has successfully implemented quality initiatives. The Legislature provided no instructions on how HHSC is to make its determination and did not require the agency to document its determination. The determination can be based on data (of unspecified type or origin) or on other evidence the organization provides. Similarly, the Legislature provided no guidance or restriction on how HHSC is to implement any preference under this statute or weigh it against preferences required by other statutes. Again, HHSC'S discretion regarding the manner in which it applies the preference is absolute. *Hall*, 508 S.W.3d at 243.

### 2. The evidence

HHSC's Deputy Executive Commissioner for Contract Management and Procurement Strategy, James Ramirez, used section 536.052 as an example of how the agency incorporated statutory preferences into the BVC and how information informing the preference was solicited through technical questions in the RFP. The trial court asked: "How are the statutory requirements that he pointed to on that board -- how are they incorporated in the scoring?" Ramirez answered: "They are incorporated in the technical questions and then a higher score being given for good answers to quality -- so the easiest one to talk about is 536.052 of the Government Code." 6RR208. He further explained: "We constructed a set of questions, mostly in BVC 4, that speak to quality initiatives and the quality items in Subsection (a) of that statute." *Id*.

Ramirez also explained how the statements of work associated with BVC 4 informed each prospective bidder of HHSC's interest in the bidder's quality initiatives, quality indicators, assessment, and performance. 6RR209-11. BVC 4 informed respondents that HHSC sought to determine whether each bidder "[d]emonstrates proven strategies to monitor and manage healthcare quality and improve key quality metrics that align with the goals of the State." 9RR318. To drill down on this issue, Technical Question 13 was all about quality initiatives. It asked each respondent to:

Describe the Respondent's **Quality Improvement and performance evaluation strategies and initiatives** specific to the STAR, CHIP, and HTW populations. At a minimum, the response should:

a. Identify methods for evaluating Member outcomes and how the evaluation results are incorporated into the **Respondent's Quality Improvement program**;

b. Describe processes for incorporating Provider input into the design and evaluation of the Respondent's **Quality Improvement strategies and initiatives** and processes for disseminating outcome results to Providers for continued improvement; and

c. Describe a clinical or non-clinical initiative that Respondent proposes to pursue in the first year of the Contract specific to the HTW population and why the topic warrants investment. Describe the Respondent's measurable goals for the initiative and how its impact will be evaluated.

9RR330 (emphasis added). As Ramirez explained, HHSC implemented the statutory preference by assigning higher scores to respondents that demonstrated successful quality initiatives in their responses to this question. 6RR211-12. HHSC unquestionably had discretion to implement the statutory preference in this manner.

Not surprisingly, implementation of quality initiatives proved to be another factor with limited utility in distinguishing among the sophisticated bidders on this RFP. Appellees well understood that Technical Question 13 and its associated statements of work solicited this information, and all of them—as well as the other respondents—were able to identify successful quality initiatives.

34

Texas Children's led off its response to question 13 by noting that a "commitment to continuous quality improvement (QI) is embedded in our organization's strategic goal." 14RR502. It emphasized that its "**commitment to continuous QI ·was most recently demonstrated by obtaining NCQA accreditation.**" *Id*. (emphasis in original). Among innumerable references to quality initiatives throughout its response to question 13, Texas Children focused on a successful "Initiative to Improve Follow-up After Hospitalization for Mental Illness" and an "Initiative Using Data Stratification to Identify and Address Disparities in Health Outcomes." 14RR506.

Wellpoint devoted its answer to Technical Question 13 to discussing its "nationally accredited Quality Assurance and Performance Improvement (QAPI) Program." 10RR116. Focusing on the implementation of quality initiatives, Wellpoint told HHSC: "We designed our QAPI program to achieve measurable improvements in health care efficiency, effectiveness, performance, accountability, and Member outcomes." *Id*. Wellpoint described in detail the process it employs "to design, implement, and evaluate all our QI initiatives, including our QI projects." 10RR119-20. Wellpoint assured HHSC that it is continuously "**Implementing Interventions to Improve Outcomes.**" *Id*. (emphasis in original).

Superior opened its response to Technical Question 13 by stating that its quality improvement efforts show "program effectiveness in all Service Areas." 15RR109. Superior highlighted specific examples in which it had successfully implemented quality initiatives, including its achievement of "a 16% improvement from 2019-2020 in Asthma Medication Ratio and a 5% improvement in comprehensive diabetes care from 2020 to 2021 for STAR Members." *Id*. The balance of Superior's response to question 13 focuses on the successes of its Quality Assurance and Performance Improvement Program." 15RR109-118.

Cook Children's likewise focused on its Quality Assurance and Performance Improvement Program in responding to Technical Question 13. 13RR105-114. Touting its successful implementation, Cook Children's told HHSC that its program "accounts for all demographic groups, care settings, and types of services provided to STAR and CHIP." 13RR105. The response outlined Cook Children's quality improvement goals for 2022 and explained the methods by which improvement would be evaluated. 13RR106. Then it provided charts demonstrating the statistical success of numerous quality-improvement initiatives Cook Children's had implemented. 13RR107.

Thus, the evidence establishes with unmistakable clarity that HHSC solicited via Technical Question 13 information relevant to Government Code section 536.052(d), and every single Appellee provided this information in response.

Coupled with undisputed proof that HHSC considered all information provided in the responses, and HHSC evaluated that information in determining the scores, this proof conclusively establishes compliance with the statute. *See* 5RR109-110; 5RR171; 5RR185; 5RR190; 5RR197; 7RR29.

No Appellee introduced evidence that it had successfully implemented quality initiatives and yet received a low score on Technical Question 13. No Appellee proved that competing MCOs had *not* implemented quality improvement initiatives. No Appellee established that, had it received a higher score on Technical Question 13, it would have overtaken a winning bidder's total score. Thus, there is no evidence that HHSC—much less the Executive Commissioner— failed to follow section 533.052(d) and no evidence that applying the statutory preference differently would have altered the outcome of the procurement.

## C. Government Code section 2155.144(c) and (d)(5)

(c) An agency to which this section applies shall acquire goods or services by any procurement method approved by the Health and Human Services Commission that provides the best value to the agency. The agency shall document that it considered all relevant factors under Subsection (d) in making the acquisition.

(d) Subject to Subsection (e), the agency may consider all relevant factors in determining the best value, including:

\* \* \*

(5) indicators of probable vendor performance under the

37

> contract such as past vendor performance, the vendor's financial resources and ability to perform, the vendor's experience and responsibility, and the vendor's ability to provide reliable maintenance agreements.

Tex. Gov't Code § 2155.144.

### 1. The text

Section 2155.144 of the Government Code emphasizes the breadth of HHSC discretion in procuring contracts, requiring it to "acquire goods or services by any procurement method approved by the Health and Human Services Commission that provides the best value to the agency." Tex. Gov't Code § 2155.144(c). It goes on to require the agency to document that it "considered" "all relevant factors under Subsection (d) in making the acquisition." *Id.* This statute does not require the agency to give a preference, and it does not dictate any course of action the agency must take based on its "consideration" of any factor.

Subsection (d) sets forth a non-exclusive list of factors the agency "may consider," including "indicators of probable vendor performance under the contract ***such as*** past vendor performance, the vendor's financial resources and ability to perform, the vendor's experience and responsibility, and the vendor's ability to provide reliable maintenance agreements." Tex. Gov't Code § 2155.144(d)(5) (emphasis added). Appellees contend the Executive Commissioner acted *ultra vires* because HHSC failed to consider and document the agency's consideration of

38

respondents' past performance. To make their argument, Appellees pretend that they did not realize from the RFP that HHSC was interested in a vendor's past performance and insinuate that, despite being incumbent contractors, they did not discuss their past performance in responding to the RFP. This is nonsense.

## 2. The evidence

Sixteen of the 18 bidders, including all four Appellees, were already providing managed care services in Texas under contract with HHSC at the time of this procurement. 6RR180-81. These sophisticated, experienced government contractors knew perfectly well that emphasizing their past achievements was an effective way to promote their qualifications to be selected under the current RFP.

For example, Wellpoint's representative testified: "We have been involved in multiple procurements in the state of Texas, and we know that providing past performance is a good thing to do to prove that you are a good customer, that you provide high-quality care." 8RR116. Accordingly, Wellpoint conceded that its response to this RFP "is filled with references to its past performance and accomplishments." 8RR108. Wellpoint, in fact, touted its past performance "in almost every paragraph" of its response. *Id*. Cook Children's representative testified that its response to the RFP likewise "include[d] several highlights of [its] 25-year record of outstanding performance." 8RR159.

Testimony aside, Appellees' responses to the RFP conclusively demonstrate that they all focused on their past performance. Looking no further than its two-page Executive Summary, Wellpoint touted (all emphasis in original):

- ***Our model drives outcomes, such as our 25.24% improvement in post-partum care from 2011-2022 (a top score in the State for this measure), to address the most significant Member needs.***

- As evidenced by our NCQA Health Equity Accreditation, advancing health equity is core to our purpose.

- We have partnered with our robust Network for more than 20 years — with Providers Members can trust.

- ***Amerigroup [n/k/a Wellpoint] placed first across all Texas Managed Care Organizations (MCOs) in more than 10 HEDIS® measures in 2020 and increased more than 20 measures between 2018 and 2020.***

- ***Our record of submitting reports timely along with our 99% quality scorecard performance in FY 2021 is an indicator of our commitment to the performance of CHIP, STAR, and HTW.***

10RR23-24. This summary set the tone for a multi-thousand page response chock full of discussion of the entity's past performance as an indicator of its ability to serve under the RFP. *See* 10RR–11RR.

Superior opened its Executive Summary by noting, with a typo, that it "[serves] over 2.1 million Texans in all 254 counties." 15RR16. It went on to emphasize its past performance, including (again, all emphasis in original):

- **More than 82% of** the **Members we engage accept Service Coordination, more than the combined statewide average**

40

**for MCOs serving STAR (75.3%) & CHIP (74.9%) Members.**

- We also grew our midwife network by nearly 40% giving Members increased access to prenatal and post-partum care.

- **Superior is the only MCO with Opioid Treatment Providers in Travis, MRSA Central, and MRSA West, demonstrating our ability to encourage Provider participation in the Medicaid program.**

- In 2022, 70% of Providers reported overall satisfaction with Superior. We streamlined the Provider enrollment process, leading to a faster turnaround and reduced the credentialing timeline by more than 50%.

- Our Members engaged in care through Providers in our APMs have 25% fewer ED visits, and CHIP Members had 30% fewer inpatient admissions when connected to PCPs in our APMs.

- From 2020-2021, FQHCs reduced Csection deliveries 5.7% and 4.2% under risk-based models.

- STAR Members saw a 26.7% decrease in Readmissions for Members with Bipolar Disorder from 2020 to 2021.

- **Our compliance average for our regulatory reports since 2020 for the STAR Program of 98.55% and for the CHIP Program of 97.80% demonstrates our consistent, timely and accurate delivery of data.**

15RR16-17. Similar past-performance references permeate the remainder of Superior's response. 15RR – 18RR.

Cook Children's, which sought a contract in only one service area, was a little more tempered. But it, too, showcased its past accomplishments where possible in its Executive Summary (emphasis in original):

41

- We began our service to the community as a CHIP health phm in 2000 and serve **over 171,000 STAR & CHIP Members** as of December 2022.

- We significantly increased the use of **Telemedicine and Telehealth** during COVID-19 and continue to develop strategies to increase its uptake, where appropriate and effective for our Members.

- Our successful implementation and robust oversight of the **Nonemergency Medical Transportation** benefit ensures transportation to medical appointments.

- We also currently **contract with 1,400 HTW Providers** and will modify these Provider contracts to include the HTW Program.

13RR13-14. Cook Children's repeatedly referenced its past performance throughout the rest of its proposal. *See* 13RR–14RR414.

The record does not include Texas Children's Executive Summary. But its heavily redacted answers to the technical questions amply demonstrate that, like the other Appellees, Texas Children championed its past performance in its effort to earn new contracts, including frequent reference to Texas Children's "more than 25 years of experience in Texas Medicaid." For example, Technical Question 17 directed respondents to: "Provide examples of how trends are identified and used to inform continuous improvement activities and Service delivery." 9RR332. It would be impossible to answer this question without reference to past performance, and here are a few examples in Texas Children's response:

- Over the last two years, TCHP has invested heavily into systems, data, and technology that allow us to identify, analyze, and continuously improve based on the trends in our service delivery and utilization patterns.

- TCHP has operated in STAR and CHIP for over 25 years.

- TCHP has redefined its internal processes and has opened data access to the Medical Economics team, which has improved data knowledge across the organization.

- In the first quarter of 2021, an evaluation of ED activity was completed, during which we noticed an upward trend of ED utilization.

- We successfully implemented an equitable vaccine allocation process and framework using TCHP's geospatial analysis team's analytics tracking the COVID-19 spread and vaccination rates at the time of each vaccination rollout for people under 18 years old.

- TCHP's efforts in the COVID-19 vaccine rollout contributed to the reduction in COVID-19-related inpatient admissions and costs.

- In response to a recent 32% increase in inpatient admission among Members with sickle cell disease, TCHP created a disease management program.

14RR536-42. Similar examples can be found in Texas Children's responses to the other technical questions. *See* 14RR415-549.

Consistent with these examples, the Executive Commissioner testified that, in every response she personally reviewed, the bidder "included their past performance about whatever the question was – the requirements were to address

43

how they could meet it and how they've done it before and doing it now." 6RR177. And it is undisputed that whatever information bidders included about their past performance was considered and reflected in their scores. 5RR109-110; 5RR171; 5RR185; 5RR190; 5RR197; 7RR29.

Appellees repeatedly sought to extract sound-bite testimony to the effect that HHSC must not have "considered" past performance because the RFP did not include a stand-alone question to the effect of "how's your past performance been?" Yet the evidence is undisputed that all respondents necessarily discussed their past performance in their responses, and HHSC considered this information in determining each respondent's score. Ramirez explained:

> Q. Well, I think we talked about the fact that HHSC didn't consider past performance; correct?
>
> A. If it was included in the responses we did.
>
> Q. Okay.
>
> A. I mean, if you answer -- most people answered the questions with past performance, so that's what they were scored on.
>
> Q. But as you sit here today, you're not aware of any specific document we could look to to show that past performance was considered?
>
> A. It was considered if it was -- we evaluated the responses, so if it was in the responses it was considered. I don't want to suggest we didn't consider everything that y'all put in your responses. So if past performance was there, it was considered.

44

Q. And do you know whether any evaluator factored that into their scoring?

A. Again, the scoring was the entire response to the technical question. So, I mean, if you had included information, it would have been included in the scoring based on how the scoring went.

5RR109-110.

Despite this overwhelming proof that the RFP requested, Appellees provided, and HHSC **considered** information relating to every respondent's past performance, Appellees zero in on a few acontextual soundbites and anecdotes. They posit, for example, that HHSC could not possibly have considered past performance because Molina—the top scoring respondent—scored in the lower ranges for quality of care according to certain publicly available report cards. 5RR261-62. But HHSC answered this vacuous accusation. When she learned from the procurement staff that the children's hospital plans did not score well enough to earn contracts, the Executive Commissioner personally investigated whether there was a principled way to add them back. But she could not find a path to that result because HHSC cannot look at just one or two performance measures such as the report cards. Rather "[w]e have hundreds of performance measures that we've used on a SDA basis, and there wasn't a principled way to add them back in." 6RR141.

More importantly, Appellees cannot pursue an *ultra vires* case under this statute based on their view that HHSC did not "consider" past performance properly or adequately. Section 2155.144 of the Government Code does not include a standard by which the sufficiency of HHSC's "consideration" of past performance can be judicially evaluated. The Legislature requires the agency to do nothing more than "consider" factors that indicate "probable vendor performance under the contract," of which past performance is merely an example. Tex. Gov't Code § 2155.144. The record conclusively shows that HHSC considered everything Appellees had to say about their past performance, negating their *ultra vires* claim and any probable right of recovery as a matter of law.

Proof of causation is lacking here as well. No Appellee introduced evidence that its score would have surpassed that of a winning bidder in its preferred service area if only HHSC had "considered" its past performance.

Nor can Appellees' case survive based on the statute's documentation requirement. The concept of past performance was so pervasive throughout the RFP, the responses, and the evaluations that, as Ramirez testified, the entirety of the procurement file documents HHSC's consideration of past performance. 5RR227. Of course, the consensus scoring rubrics that Appellees successfully persuaded the trial court not to consider are replete with discussion of all respondents' past performance. 19RR–20 RR. And even if the statutory

46

documentation requirement were somehow lacking, that would merely emphasize the improvidence of implementing a draconian judicial remedy before the Executive Commissioner determines Appellees' protest appeals. If she were to find that HHSC did not properly document its consideration of the bidders' past performance, she could require "appropriate remedial action" far less disruptive than barring the entire procurement from moving forward. 1 Tex. Admin. Code, § 391.307(c)(2).

## D. Government Code section 533.002

> The commission shall implement the Medicaid managed care program by contracting with managed care organizations in a manner that, to the extent possible:
>
> (1) improves the health of Texans by:
>
> (A) emphasizing prevention;
>
> (B) promoting continuity of care; and
>
> (C) providing a medical home for recipients.

Tex. Gov't Code § 533.002 (now Tex. Gov't Code § 540.0051).

### 1. The text

Appellees focus on subsection (1)(B), which directs HHSC—not the Executive Commissioner, but the commission—to "implement the Medicaid managed care program by contracting with managed care organizations in a manner that, to the extent possible . . . improves the health of Texans by . . . promoting continuity of care." This provision has nothing to do with HHSC's

discretion in drafting RFPs, evaluating responses, or selecting entities with which it will contract. Rather, the statute addresses only the manner in which the selected MCOs will be contracted. HHSC plainly and undisputably satisfied this statutory requirement.

## 2. The evidence

The state Medicaid Director explained how HHSC satisfies the statutory mandate of contracting in a manner that, to the extent possible, promotes continuity of care:

> So we have a lot of continuity of care requirements in our contract both for a transition like this and for every day. So right now we -- for kind of regular times not related to a procurement change, we have a requirement that for 90 days if a plan receives a new member who just switched to them, that they would have to honor all the prior authorizations in place, they have to honor that member's relationship with their provider, with their providers even if they're out of network until the plan has a chance to assess that person themself if needed or help them switch to a new provider. It's also, you know, likely -- these plans don't have exclusive networks, so providers are often in, you know, the network of multiple plans, so it's possible someone would switch and not have to switch providers at all.

7RR62. She even offered undisputed evidence that HHSC's approach *works*, explaining that the same contracting approach that HHSC is pursuing here was recently implemented in the procurement of another Medicaid program, with a high degree of success in maintaining continuity of care:

48

During these times where we have a procurement, there's a kind of extra long continuity period in the contract for these transitions that's six months. So for six months the plan has to honor those prior authorizations, honor that member's relationship with their provider. And, you know, we just rolled out our STAR+PLUS program, procured that. This went into -- STAR+PLUS went into effect a month ago. And we had those same requirements there where that very high needs population of older adults and people with disabilities, you know, some of them transitioned plans, and we have those requirements in place, and we have heard very few complaints or questions about any continuity issues.

7RR62-63. Appellees did not offer one whit of evidence to the contrary.

Consistent with this testimony, the Statement of Work in the RFP sets forth lengthy, detailed contract requirements that a winning bidder must meet to promote continuity of care. *See* 12RR731-34. The contractual mandate straightforwardly implements the statutory requirement: "For newly enrolled Members, ***the MCO must ensure that care is not disrupted or interrupted***, particularly for Members whose health or BH condition has been treated by specialty care providers, or whose health could be placed in jeopardy if Covered Services are disrupted or interrupted." 12RR731 (emphasis added). The contractual requirements implementing this directive go on for pages. There is no evidence identifying a different manner of contracting that would promote continuity of care to a greater extent than the way HHSC is doing it.

Nevertheless, Appellees succeeded in using section 533.002 as a smokescreen to obscure the trial court's vision of the hearing record. They emphasized the superficial point that whenever an incumbent plan is not selected for a new contract, by definition, that plan's members must change to a new managed care plan. The mere fact that HHSC does not intend to select the incumbent plan for a new contract in every instance cannot possibly mean that HHSC is proposing to contract in a manner that does *not* promote continuity of care "to the extent possible."

Yet the trial court was seemingly distracted by the smokescreen. On the first day of the hearing, after an HHSC witness testified that the agency did not consider the mere fact that members' plans might change because of the legislatively mandated new procurement of the managed care contracts, the court incredulously interrupted:

> THE COURT: Hang on a second. All right. Just stop for a minute.
>
> MR. COULTER: Yes, Your Honor.
>
> THE COURT: So we have 1.5 million Texans switching plans, and you didn't consider that a continuity of care issue; is that right?

5RR190. The trial court erroneously equated the fact that members will change healthcare *plans* with a disruption in the continuity of their health*care*. An HHSC witness later again explained that continuity of care was not a major factor in

50

scoring the bidders' proposals because all successful bidders were contractually required to ensure continuity of care when members transitioned from one plan to another—exactly what the statute addresses. The court again expressed its skepticism, seemingly suggesting that a non-incumbent plan was presumptively incapable of complying with HHSC's contractual requirements regarding continuity of care:

> Q. (BY MR. TRAHAN) So continuity of care was not a major factor in the scoring process for this procurement, was it?
>
> A. It was not a major factor because it is something that is inherently expected of all managed care organizations that when a member switches from one plan to another, whether it is their choice or their plans have switched out, that their care does not drop off. That is inherent in the operation of the Medicaid program.
>
> THE COURT: But how did you determine that other than what they told you?
>
> THE WITNESS: How did -- I'm sorry?
>
> THE COURT: How did you determine whether or not the care would drop off? I mean, how did you know that the care wouldn't drop off?
>
> THE WITNESS: Because there's requirements in the statement of work around that that --
>
> THE COURT: Yeah, but the only thing you had to show that was what those care plans told you; is that right?
>
> THE WITNESS: Yes, ma'am, what they --
>
> THE COURT: Okay. That's all I want to know. Go ahead, Mr. Trahan.

6RR82-83. But the statute does not require HHSC to "know" that care will not drop off or to contract with incumbent plans forever. Section 533.002 only requires the agency to incorporate provisions into its MCO contracts that promote continuity of care to the extent possible. That is exactly what HHSC did. The evidence conclusively establishes that the Commissioner is not acting *ultra vires* when HHSC contracts with MCOs in the manner outlined in SOW 2.6.48, which has multiple requirements to meet this statutory directive. 12 RR731-34.

### E.    Government Code section 533.004

This statute concerns mandatory Medicaid contracts. STAR is a Medicaid program. CHIP is not. Four respondents qualified for a "mandatory" STAR contract in their service area, and Appellees do not complain about HHSC's intent to award STAR contracts to these four bidders. *See* Tex. Gov't Code § 533.004 (now Tex. Gov't Code §540.0206). HHSC also intends to award a CHIP contract to each of these four bidders in the same service area as their STAR contract. Appellees accuse the Executive Commissioner of acting *ultra vires* with respect to these CHIP contracts.

It is undisputed that the entities entitled to mandatory STAR contracts did not outscore Appellees. Appellees contend that HHSC's announced intent to award CHIP contracts to entities with inferior proposal scores violates the agency's statutory duty to "ensure that all contracts with child health plan providers under

Section 62.155 are procured through a competitive procurement process in compliance with all applicable federal and state laws or regulations." Tex. Health & Safety Code § 62.055(f).

But Appellees ignore the accompanying provision in section 62.155 that in selecting a health plan provider under CHIP, the commission "may give preference to a person who provides similar coverage under the Medicaid program." Tex. Health & Safety Code § 62.155(c)(1). The statutory text does not provide the agency with guidance regarding the manner in which it "may" apply this preference or the weight it "may" give to the preference. These details are left to HHSC's absolute discretion. *Hall*, 508 S.W.3d at 243.

Exercising this discretion, HHSC determined there were sufficient practical reasons to couple the CHIP contracts with the four mandatory STAR contracts. As resources available to low-income parents change, the plan under which each of their children qualifies for benefits—STAR or CHIP—frequently changes too. It is not uncommon for a particular child to switch between a STAR plan and a CHIP plan multiple times. *See, e.g.*, 6RR87 (explaining the "ping-pong" eligibility consequences of a mom getting a second job and then losing the job six months later). Under the express authority of section 62.155(c)(1), "the agency recognized that kids move back and forth between these programs and it would just be better for the kids if they didn't have to change plans when that happens, so you link

53

STAR and CHIP, and so if they have to move back and forth, they're still in the same MCO, and that MCO has both contracts." 6RR86.

The Executive Commissioner testified that HHSC has been coupling STAR and CHIP contracts for this reason "going back to the mid-90s." 6RR154. In terms establishing the antithesis of an *ultra vires* act, she explained: "the children that we serve tend to move back and forth between Medicaid and CHIP because their income levels fluctuate." *Id*. "[B]y awarding them together, you ensure that children are able to move seamlessly, as their incomes fluctuate fairly frequently, and continue to have one plan with a family." 6RR155. In some instances, a family with two children may have one child eligible for STAR and one eligible for CHIP, in which case "having one plan is really helpful, even though your kids are in Medicaid and CHIP." *Id*.

That Appellees convinced the trial court to second-guess such a quintessential exercise of the discretion vested in the state agency responsible for administering these programs underscores the folly of this entire case. Because the coupling of CHIP contracts with mandatory STAR contracts is plainly within the commission's absolute discretion to apply the preference of section 62.155(c)(1) in favor of the families these programs serve, it cannot support Appellees' attempt to overcome the Executive Commissioner's immunity from suit, much less support an injunction against completing this procurement.

54

### F.    Government Code section 533.003(a)(3)

> In awarding contracts to managed care organizations, the commission shall:
>
> (3) consider the need to use different managed care plans to meet the needs of different populations.

Tex. Gov't Code § 533.003(a)(3) (now Tex. Gov't Code § 540.0204(3).

#### 1.    The text

Here again, Appellees rely on a statute that does not mandate a procurement preference or impose a documentation requirement.   The text requires the agency—not the Executive Commissioner, but the commission—to do nothing more than "consider" whether it needs to use different managed care plans to meet the needs of different populations.   HHSC has absolute discretion regarding the effect, if any, this consideration may have on the award of a contract.  *Hall*, 508 S.W.3d at 243.

#### 2.    The evidence

The RFP is permeated with inquiries about each plan's ability to meet the needs of different populations within each program.  BVC 1, for example, focused on respondents' ability to deliver "person-centered" services, tailored to the individual needs of the varying Medicaid and CHIP populations.  9RR317.  BVC 2 further concerned respondents' ability to manage and support different members' needs in a manner that is "culturally and linguistically appropriate, accessible, and responsive."  9RR317.

The oral presentations covered each bidders' ability to meet the needs of pregnant women, focusing on maternal mortality and morbidity. 9RR319. Technical Question 1 solicited information on each plan's ability to develop a person-centered service plan and to meet the needs of members with special health care needs. 9RR325. Technical Questions 3, 4, and 8 asked each plan to explain its ability to serve a member with unique health care and/or communication needs. 9RR326, 328. Technical Question 13 required bidders to explain their quality improvement and performance evaluation strategies and initiatives specific to the varying populations of the STAR, CHIP, and HTW programs. 9RR330.

When HHSC's Medicaid Director explained in detail that these technical questions solicited the very information section 533.003(a)(3) requires HHSC to "consider," 9RR82-98, Appellees aptly demonstrated that their entire complaint is based on a misunderstanding (or mischaracterization) of the statute:

> Q. Why didn't you just ask them in terms of your past performance, what have you done to meet the needs of different populations? Why didn't you just ask that question like the statute requires?

7RR89. Nothing in section 533.003(a)(3) links this issue to "past performance" and nothing in the text "requires" HHSC to ask in the RFP "what have you done to meet the needs of different populations?" Not only does HHSC have absolute discretion on how to solicit and evaluate information that statute merely requires the agency to "consider," but the specific series of technical questions HHSC

56

developed is an objectively superior way of seeking information relevant to the specific populations of the STAR and CHIP programs.

Appellees' unsupported contention that HHSC should have phrased the questions differently comes nowhere close to supporting a cause of action against the Executive Commissioner for acting outside of her statutory authority. And, once more, Appellees offered no proof whatsoever that they would have overtaken a higher-scoring bidder of only HHSC had "considered" the needs of different populations in some unspecified different manner. The record relating to the section 533.003(a)(3) requirement conclusively negates both Appellees' attempt to overcome the Executive Commissioner's immunity and the probable-right-of-recovery element of the injunction claim.

## G. PIA disclosure of responses that Appellees redacted

Appellees' claim that the inadvertent disclosure of heavily redacted RFP responses "destroyed the integrity of the procurement process" rests entirely on speculation. The record flatly contradicts their assertion that the Executive Commissioner acted *ultra vires*, and it provides no basis for enjoining completion of the procurement.

The facts are not in dispute—though Appellees obscure them through selective framing. On August 11, 2023, Aetna's outside counsel in Ohio submitted an open records request to HHSC seeking proposals from a completed procurement

57

for the STAR+PLUS program, which serves adults with disabilities and seniors. 9RR1053. The STAR+PLUS procurement is wholly separate from the STAR and CHIP procurement at issue here, which concerns children and pregnant women. 9RR293.

Due to a clerical error, a legal assistant in HHSC's Open Records Department mistakenly sent a CD to the law firm containing "redacted Public Information Act copies" of the proposals relating not to the STAR+PLUS procurement, but to the STAR and CHIP procurement at issue here. 9RR402. These same redacted proposals are on HHSC's public website, including Appellees' redacted proposals that are in the public record of this case. *See* 10RR–11RR; 13RR–14RR414; 14RR415-549; 15RR–18RR. Appellees themselves decided what to redact in the proposals, and they submitted the redacted versions to HHSC with the express understanding that they were "Public Information Act copies" subject to disclosure under the Public Information Act. 9RR343-45. HHSC sent the CD to Aetna's outside counsel more than six months after Aetna submitted its bid in response to the RFP and shortly before the oral presentations that comprised the last 10% of the scoring. 9RR402.

Appellees did not serve discovery on Aetna or its counsel or call a witness from either organization to testify at the hearing. There is no evidence of what Aetna's counsel did upon receiving the unrequested information. Specifically,

there is no evidence that counsel provided the CD to Aetna and no evidence that Aetna used it in any way in connection with the procurement at issue.

Instead, Appellees rely on a chain of hypotheticals: if Aetna received the CD, and if it was shared internally, and if it influenced oral presentations, then perhaps it affected scoring. This is pure conjecture. The Deputy Executive Commissioner testified unequivocally that HHSC does not know what the law firm did with the CD and does not know what Aetna used to prepare its presentation. 5RR139. Appellees' expert likewise offered only conditional speculation—"If Aetna had received this redacted proposal…"—without any proof of receipt, use, or impact. *See e.g.* 6RR37.

The only concrete evidence on this issue disproves causation. The Deputy EC reviewed the matter during Appellees' protest appeals and appropriately reasoned and ultimately concluded that the disclosure did not compromise the integrity of the procurement. 5RR148. Notably, oral presentations did not alter the bidders' relative rankings, and scoring would not have changed even if Aetna had received the CD. 5RR140; 5RR149.

The scoring data confirms this. All 18 bidders performed competently, with no oral presentation score below 170 out of 200. 9RR1059–60. Aetna earned 190 points. 9RR1059. Even if Aetna had scored the lowest of all oral presentation

scores—170—its overall score would still have exceeded the highest-scoring Appellee by 12 points. 9RR1062.

At most, Appellees have shown that an HHSC legal assistant made a clerical mistake. Once realized, HHSC senior staff diligently evaluated the impact of the mistake and determined that it was immaterial to the procurement. Such a mistake is not an *ultra vires* act—certainly not one attributable to the Executive Commissioner. There is no evidence that Aetna received the information, no evidence that Aetna used it, and no evidence that it affected the outcome. Speculation and stacked inferences cannot overcome the Executive Commissioner's immunity or satisfy Appellees' burden to show a probable right of recovery.

PRAYER

For all of these reasons, Aetna respectfully urges the Court to vacate the trial court's order, dismiss this case with prejudice, and award Aetna such further relief to which it may be entitled.

Respectfully submitted,

EWELL, BROWN, BLANKE & KNIGHT LLP
/s/ *Joseph R. Knight*
Joseph R. Knight
State Bar No. 11601275
111 Congress Avenue, 28th Floor
Austin, Texas 78701
512.770.4010
jknight@ebbklaw.com

60

TAFT STETTINIUS & HOLLISTER LLP
/s/ *Marc J. Kessler*
Marc J. Kessler
Admitted *Pro Hac Vice*
41 South High Street, Suite 1800
Columbus, Ohio 43215-6106
(614) 220-0237

*Attorneys for Aetna Better Health of Texas, Inc.*

## CERTIFICATE OF COMPLIANCE

As required by Texas Rule of Appellate Produce 9.4(i)(3), I certify that this Brief contains 13,142 words, excluding the parts of the brief exempted by Rule 9.4(i).

/s/ *Joseph R. Knight*
Joseph R. Knight

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been filed and served on all counsel of record on September 29, 2025, via the Court's electronic filing service.

/s/ *Joseph R. Knight*
Joseph R. Knight

## APPENDIX

1. Trial court order

2. Appellees' "Summary of the Evidence"

61

# APPENDIX 1

CAUSE NO. D-1-GN-24-003839

| | | |
|---|---|---|
| COOK CHILDREN'S HEALTH PLAN;<br>TEXAS CHILDREN'S HEALTH PLAN;<br>SUPERIOR HEALTHPLAN, INC.; and<br>WELLPOINT INSURANCE COMPANY, | §<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| **Plaintiffs,** | §<br>§ | |
| v. | §<br>§ | TRAVIS COUNTY, TEXAS |
| CECILE ERWIN YOUNG, in her official<br>capacity as Executive Commissioner of the<br>Texas Health and Human Services<br>Commission, | §<br>§<br>§<br>§<br>§ | |
| **Defendant.** | §<br>§ | **353rd JUDICIAL DISTRICT** |

## TEMPORARY INJUNCTION AND ORDER DENYING DEFENDANT'S PLEA TO THE JURISDICTION

Before the Court are the Applications for Temporary Injunction (the "Applications") filed by Plaintiffs Cook Children's Health Plan ("Cook Children's"), Texas Children's Health Plan ("TCHP"), Superior HealthPlan, Inc. ("Superior"), and Wellpoint Insurance Company ("Wellpoint," and collectively, "Plaintiffs"); and the Plea to the Jurisdiction (the "Plea") filed by Defendant Cecile Erwin Young ("Defendant"), in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"). After considering Plaintiffs' Applications and Defendant's response; Defendant's Plea and Plaintiffs' responses; the pleadings and attached evidence in these consolidated cases (Nos. D-1-GN-24-003839, D-1-GN-24-003874, D-1-GN-004059, and D-1-GN-24-004327); the parties' prehearing briefing; the evidence admitted in the record and adduced at the hearing held on September 30, October 1, October 2, and October 4, 2024; applicable authorities; the arguments of counsel, and all other matters properly before the Court, the Court DENIES Defendant's Plea and GRANTS Plaintiffs' Applications.

169847251.2

The Court makes the following findings:

1. The Court has subject-matter jurisdiction over the claims in these consolidated cases because Plaintiffs have alleged and offered evidence demonstrating that Defendant will act *ultra vires* in awarding, executing, and implementing the contracts arising out of Request for Proposals No. HHS0011152 (the "RFP" or "STAR & CHIP RFP") because she has acted *ultra vires* in administering the RFP. Plaintiffs properly seek only prospective relief—specifically, injunctive relief prohibiting Defendant from awarding, executing, or otherwise implementing the intended RFP contracts and thus preventing further unlawful acts in connection with Defendant's procurement or contracting processes, as well as accompanying declaratory relief. Accordingly, sovereign immunity does not bar Plaintiffs' claims or deprive the Court of subject-matter jurisdiction.

2. The Court has personal jurisdiction over the parties in these consolidated cases.

3. Venue is proper in this Court.

4. Through the RFP, Defendant sought to procure managed care services for the State of Texas Access Reform ("STAR") Medicaid program and the Children's Health Insurance Program ("CHIP," and together with STAR, "STAR & CHIP").

5. Plaintiffs allege that Defendant administered the RFP in a manner that violates Texas law and that, consequently, any award, execution, or implementation of the intended STAR & CHIP managed care contracts that Defendant announced on March 7, 2024, will constitute *ultra vires* acts.

6. Plaintiffs have established a cause of action against Defendant and a probable right to the relief sought on their claims that Defendant has violated and, unless enjoined, will continue to violate statutory and regulatory requirements applicable to the RFP.

7. Specifically, Plaintiffs have established that Defendant has violated and will continue to violate the Texas Government Code, Texas Health and Safety Code, and Texas Administrative Code in procuring managed care contracts for STAR & CHIP in Texas, and that any award, execution, or implementation of Defendant's intended contract awards would be unlawful, because:

- Defendant's intended contract awards will fail to give preference to managed care organizations ("MCOs") that have significant participation in their provider networks from each healthcare provider in the region who has traditionally provided care to Medicaid and charity care patients as required by Texas Government Code § 533.003(a)(1);

- Defendant's intended contract awards will fail to give preference to MCOs that have successfully implemented quality initiatives as required by Texas Government Code § 536.052(a) and (d);

- Defendant has failed to develop and implement the cost-efficiency and quality of care benchmarks mandated by Texas Government Code § 536.052(b) despite being subject to an obligation to do so for over a decade. Defendant's intended contract awards will likewise fail to give preference to MCOs that have met such benchmarks as required by Texas Government Code § 536.052(d);

- Defendant's intended contract awards will fail to consider MCOs' past performances as required by Texas Government Code § 2155.144;

- Defendant's intended contract awards will fail to evaluate and certify that MCOs are reasonably able to fulfill the terms of the STAR contract as required by Texas Government Code § 533.0035 and to review MCOs to confirm their ability to fulfill the requirements of the CHIP contract as required by Texas Health & Safety Code § 62.051(e);

- In August 2023 and again in October 2023, Defendant wrongfully disclosed the RFP proposals of Plaintiffs and other respondents—with the August disclosure recipients including legal counsel for Aetna, one of the competing respondents, while the procurement was ongoing and prior to completion of the oral presentations—thus, destroying any integrity of the procurement process and creating an unlevel playing field that cannot ensure fair consideration of all proposals and is far from consistent, uniform, and transparent as required by 1 Texas Administrative Code §§ 391.101 and 391.209;

- Defendant's intended contract awards will fail to implement the Medicaid managed care program in a manner that improves the health of Texans by promoting

continuity of care and provides a medical home for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to reduce administrative and other nonfinancial barriers for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to consider the need to use different managed care plans to meet the needs of different populations as required by Texas Government Code § 533.003(a)(3);

- Defendant's intended contract awards will unlawfully award mandatory CHIP contracts to MCOs to which Defendant intends to award mandatory STAR contracts in violation of Texas Health and Safety Code §§ 62.055 and 62.155;

- Defendant's intended award of mandatory CHIP contracts will fail to give consideration to statutorily required factors, including those under Texas Government Code § 533.003, in violation of Texas Government Code § 533.004(a);

- Defendant's continuing practice of denying relevant information about a procurement to bidders until after the deadline to submit a bid protest violates the Due Course of Law provision of Article I, Section 13 of the Texas Constitution by not providing a meaningful bid protest process after promising one in 1 Texas Administrative Code Chapter 391; and

- Defendant's continuing practice of refusing to consider as untimely any information submitted in supplemental protests and/or after the protest filing deadline is inconsistent with the procedural protections promised to protestants in bid protest rules that require consideration of a protest or appeal submitted after the filing deadline when good cause for delay is shown under 1 Texas Administrative Code § 391.307(d)(1).

8. These statutory and regulatory violations, each singly and together collectively, have resulted in intended contract awards that will be invalid and unlawful, and the further execution and implementation of such intended contract awards will be *ultra vires* acts.

9. Furthermore, Defendant is currently evaluating bids for STAR Kids, a separate Texas Medicaid managed care program, through Request for Proposals No. HHS0013071 (the STAR Kids RFP"). The procurement processes in the STAR & CHIP RFP and the STAR Kids RFP are substantively identical. Plaintiffs have demonstrated that Defendant has no intention of

Page 5878

voluntarily correcting her course of action for future procurements, including altering the processes and procedures used in administering the STAR Kids RFP. The resulting STAR Kids contract awards will therefore also violate statutory and regulatory requirements and be *ultra vires*.

10. Plaintiffs have established a probable right to relief and that Defendant's award, execution, and implementation of the intended, unlawfully procured STAR & CHIP contracts will, if not enjoined, cause Plaintiffs to suffer imminent and irreparable injury.

11. Cook Children's has established that execution and implementation of the contracts would result in irreparable harm to Cook Children's because:

- The loss of STAR & CHIP contracts threatens Cook Children's financial viability and might lead to the forced wind-down of the entity;

- Cook Children's participation in the STAR Kids program is in jeopardy because the larger STAR & CHIP contracts provide economies of scale to limit losses from STAR Kids;

- Cook Children's 100,000-plus STAR & CHIP members will be forced to change to different health plans from different companies, risking disruption to the members' healthcare and their access to their current primary care providers, specialty care providers, or both;

- Cook Children's has suffered immediate operational disruptions, including hiring difficulties and the delay of needed internal projects;

- Cook Children's can no longer negotiate a new pharmacy benefits contract alongside other Texas-only Medicaid plans and consequently will need to pay more for pharmaceuticals;

- Cook Children's 375 employees are at risk of losing their jobs—both the 70% of employees who focus on STAR & CHIP and the 30% who focus on STAR Kids; and

- New STAR & CHIP entrants in the Tarrant Service Area will likely poach Cook Children's experienced employees before the new contracts go into effect—thus threatening Cook Children's STAR & CHIP operations while it is still required to provide services under its current contracts.

12. TCHP has established that execution and implementation of the contracts would result in irreparable harm to TCHP because:

- TCHP's 425,000 STAR & CHIP members will be forced to change their health plans, impacting their access to care;

- TCHP has suffered and will continue to suffer disruptions in workforce—threatening the future viability of the health plan—as employees voice concern about job security in light of the intended contract awards;

- TCHP's 650 employees are at risk of losing their jobs, impacting the financial health of its entire Texas Children's Health Care System beyond that of the health plan;

- TCHP has already suffered and will continue to suffer the poaching of its well-trained employees by other MCOs—further endangering its operations while it remains under contract with HHSC;

- TCHP will lose members and providers, further threatening the viability of the health plan and confusing members and providers;

- TCHP has and will suffer damage to its reputation and goodwill; and

- TCHP's participation in the STAR Kids program is at risk because the larger STAR & CHIP contracts are needed to provide economies of scale to limit losses from STAR Kids. If TCHP loses its STAR Kids contract, its 26,000 STAR Kids members would need to change their health plans, thereby adversely impacting those members' access to care, adversely impacting TCHP's workforce, adversely impacting TCHP's ability to operate and damaging TCHP's reputation and goodwill.

13. Superior has established that execution and implementation of the contracts would result in irreparable harm to Superior because:

- Superior will experience a reduction in the number of STAR & CHIP members it serves today, forcing members to change plans even before the operational start date of the new contracts;

- Superior will need to begin reducing its workforce just as new MCO entrants and MCOs expanding their membership will seek to poach Superior's employees, who are already grappling with the uncertainty of their jobs in light of the intended awards;

- Providers will be less likely to contract with Superior as contract renewals are being negotiated over the next few months and Superior's leverage in provider contract negotiations will be substantially diminished;

Superior has made substantial investments in partnerships that promote HHSC's value-based care priorities. These partnerships involve risk-sharing agreements



between Superior and the partner entities and have been built to scale over time. Superior will lose the benefit of its initial investments in these partnerships; and

- Superior's ability to provide the same level of service currently provided under existing STAR & CHIP contracts through the August 31, 2025, expiration date will be diminished due to workforce challenges that would be caused by execution of the STAR & CHIP contracts, which will impact Superior's operations and cause it to suffer reputational damage.

14.     Wellpoint has established that execution and implementation of the contracts would result in irreparable harm to Wellpoint because:

- Almost 380,000 current Wellpoint members will be forced to change their health plan, thus losing access to their existing Wellpoint provider network;

- Wellpoint will be forced to consider substantial reductions in and/or relocations of its existing 1,200-plus-person workforce dedicated to the Texas Medicaid programs;

- Wellpoint has already suffered and will continue to suffer the poaching of its highly trained employees by other MCOs. During the review and transition period, which HHSC has stated will take at least a full year, Wellpoint must continue to provide uninterrupted healthcare to its members, and its ability to do so will be substantially jeopardized if there are key staff vacancies;

- Wellpoint has already suffered and will continue to suffer difficulty retaining its existing, robust provider network in the impacted service areas. Maintaining its network of healthcare providers is critical to Wellpoint's commitment to providing high-quality, cost-efficient healthcare for the entire duration of its existing contracts. Worse yet, Wellpoint has learned that some providers are informing members that Wellpoint will no longer be providing STAR & CHIP services in impacted areas and are encouraging them to switch plans on the basis of Defendant's intended contract awards;

- Wellpoint has made significant investments in service areas that it will be forced to exit and has longstanding provider partnerships with alternative payment models that were developed and built to scale over multiple years. Wellpoint will lose the benefit of its investments in those service areas and partnerships.

- There is no legal remedy that can fully compensate Wellpoint for (1) the loss of its members, (2) the harm to its business resulting from the intended, unlawfully procured contract awards, and (3) the harm to its ability to compete in a fair and lawful procurement process in future procurements; and

The harm to Wellpoint is imminent because Defendant did not follow the requirements of Texas law in procuring the STAR & CHIP contracts but



nevertheless intends to execute and begin implementing the intended, unlawfully procured contract awards. In addition, the harm to Wellpoint is imminent as Defendant does not intend to correct her unlawful course of action for future procurements or the ongoing STAR Kids RFP.

15. Plaintiffs have also presented evidence that they will begin losing STAR & CHIP members now, even though operations under the intended STAR & CHIP contract awards are not scheduled to start until September 1, 2025. Providers are already informing Plaintiffs' members that Plaintiffs will no longer be providing STAR & CHIP services in certain service areas of the state and are encouraging members to switch plans. The confusion among providers and members alike will only worsen if the intended contract awards are executed notwithstanding the pending challenge to their legality.

16. Money damages are not adequate compensation because the harms Plaintiffs will suffer cannot be measured by any certain pecuniary standard. Furthermore, Plaintiffs cannot be adequately compensated in damages because Defendant is immune from suit for damages and any limited waiver of immunity is insufficient to compensate for Plaintiffs' harms.

17. The harms to Plaintiffs outweigh any potential harms to Defendant or HHSC that would result from preserving the status quo during the pendency of these consolidated cases. Neither Defendant nor HHSC would be harmed if the execution and further implementation of the intended STAR & CHIP contracts are delayed given that (1) operations under the intended contract awards are not scheduled to start until September 1, 2025, and (2) HHSC has previously delayed the RFP several times and was able to continue providing coverage through the current STAR & CHIP contracts by extending the contracts in effect at the time.

18. The public will not suffer harm if a temporary injunction is granted but will suffer harm if Defendant executes and implements the intended, unlawfully procured contract awards. The intended contract awards will impose significant harm and confusion on millions of Texas's

STAR & CHIP members. More than 1.5 million Texans, mostly children—and 43% of the total STAR & CHIP population—will be forced to change health plans. This in turn would cause significant harms to those beneficiaries, for which there is no adequate remedy at law available against Defendant, including:

- Confusion among those beneficiaries due to difficulties in informing them of the change in available health plans;

- Disruption to those beneficiaries' access to care and continuity of care, thereby threatening the medical care and the very health and welfare of those beneficiaries; and

- Administrative burdens of finding new health plans and potentially new healthcare providers.

19.     The injunctive relief Plaintiffs request is narrow in scope and tailored to prohibit Defendant from continuing to act *ultra vires*. The balance of equities and public interest weigh in favor of granting Plaintiffs' requested injunctive relief.

Accordingly, it is therefore ORDERED that Defendant's Plea to the Jurisdiction is DENIED.

It is further ORDERED that Plaintiffs' Applications for Temporary Injunction are GRANTED. The Court ORDERS that:

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP or to further the procurement or contracting processes for the STAR & CHIP RFP; and

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from further proceeding with the procurement of, issuing a notice of intent to award or awarding contracts under, or otherwise implementing results from the STAR Kids RFP.



IT IS FURTHER ORDERED that Defendant shall provide notice of this Temporary Injunction to her officers, agents, servants, employees, and attorneys, as well as any persons or entities in active concert or participation with Defendant.

IT IS FURTHER ORDERED that Plaintiffs' bond or cash deposit in lieu of bond is set in the amount of $1,000.

IT IS FURTHER ORDERED that, on the filing by Plaintiffs of the bond and on approving the bond according to law (or the cash deposit in lieu of bond), the Clerk shall issue a Temporary Injunction in conformity with the law and the terms of this order.

IT IS FURTHER ORDERED that this Temporary Injunction shall not expire until final judgment in this case is entered or this case is otherwise dismissed by this Court.

IT IS FURTHER ORDERED that the trial on Plaintiffs' *ultra vires* claims seeking declaratory relief, permanent injunctive relief, and mandamus relief is set for November 3, 2025.

SIGNED on _October 4_, 2024.

_____
JUDGE PRESIDING

**Judge Laurie Eiserloh**
**455th District Court**

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 11/01/2024 09:28:21 _____

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH

169317251.2

# APPENDIX 2

10/4/2024 2:39 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-003839
Jessica A. Limon

CAUSE NO. D-1-GN-24-003839

| | | |
|---|---|---|
| COOK CHILDREN'S HEALTH PLAN, TEXAS CHILDREN'S HEALTH PLAN, SUPERIOR HEALTHPLAN, INC., and WELLPOINT INSURANCE COMPANY, | § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CECILE ERWIN YOUNG, in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission, | § § § § § § | |
| Defendant. | § § | 353RD JUDICIAL DISTRICT |

## PLAINTIFFS' SUMMARY OF *ULTRA VIRES* EVIDENCE

Plaintiffs Cook Children's Health Plan ("Cook Children's"); Texas Children's Health Plan ("Texas Children's"); Superior HealthPlan, Inc. ("Superior"); and Wellpoint Insurance Company ("Wellpoint," and collectively, "Plaintiffs") submit this summary of key evidence in support of their requests for temporary injunctive relief against Defendant Cecile Erwin Young ("Defendant"), in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission ("HHSC").

The key evidence summarized below was presented at the hearing on September 30, October 1, October 2, and October 4, 2024. It establishes, among other things, that (1) Defendant is committing and will continue to commit *ultra vires* acts in connection with Request for Proposals No. HHS0011152 (the "RFP" or "STAR & CHIP RFP"); (2) Defendant will not be injured if Plaintiffs' request for temporary injunctive relief is granted; and (3) Plaintiffs will suffer imminent and irreparable harms if immediate relief is not entered.



169393855.4

# I. DEFENDANT'S *ULTRA VIRES* ACTS

State officials commit *ultra vires* acts when they act without legal authority or fail to perform purely ministerial acts. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). *Ultra vires* actions also include acts of "*limited* discretion . . . in conflict with the constraints of the law authorizing the official to act." *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 163 (Tex. 2016); *see also Wilson v. Cmty. Health Choice Tex., Inc.*, 607 S.W.3d 843, 854–55 (Tex. App.—Austin 2020, pet. denied) (unlawful HHSC procurement administration can constitute *ultra vires* action).

The evidence admitted at the hearing has confirmed that Defendant is administering the STAR & CHIP RFP in conflict with governing state law by disregarding, ignoring, or otherwise violating multiple statutory and regulatory mandates. Moreover, Defendant acknowledged on the stand that these violations are ongoing—and therefore Plaintiffs properly seek prospective relief—because the STAR & CHIP RFP has not yet been completed. *See* Oct. 1 Hr'g Tr. vol. 7, at 17:22–18:1 (Young) ("[Q.] Mr. Ramirez testified earlier that the procurement is ongoing. You would agree with that? A. Yes, sir."). Indeed, Defendant indicated that she has put resolution of Plaintiffs' internal HHSC protest appeals "on pause because of the court action," *id.* at 18:5–10, and that she is awaiting this Court's ruling for guidance, *see id.* at 20:17–25 ("I know that some of the issues in this case are related to some of the same issues that some of the people who have appealed are relying on, so I want to make sure that I am following whatever the Court says."). And, if Defendant is not enjoined by the Court from executing and implementing the announced STAR & CHIP contracts, she will proceed with further *ultra vires* acts. *See id.* at 21:3–15 ("[A]ssuming the Court will allow me to move forward, I would then finish the appeals process, the review of the appeals, and make a decision, one or the other, on each of the individual appeals. And then once that process is finished, then I would move forward."); *id.* at 36:8–23 (similar).

2

The evidence has established that Defendant is violating the following statutory and regulatory requirements:

| Defendant Will Act *Ultra Vires* | |
|---|---|
| § 533.003(a)(1) | Existing provider network preference |
| § 536.052(d) | Quality initiatives preference & benchmark preference |
| § 2155.144(c) | Past performance & failure to document |
| § 533.002 | Continuity of care & reducing nonfinancial barriers |
| § 533.004 | Improper mandatory contract awards |
| § 533.003(a)(3) | Needs of different populations |
| Texas Admin. Code | Fatal disclosure of proposals |

☐ **No Preference for Medicaid and Charity Care Providers.** Defendant is failing to "give preference to organizations that have significant participation in [their] provider network[s] from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients" as required by Texas Government Code section 533.003(a)(1).

- Ms. Molina agreed that this preference is mandatory. Sept. 30 Hr'g Tr. vol. 2, at 41:19–42:2 (Molina).

- Mr. Ramirez explained that this preference relates to a respondent's existing provider network at the time of the RFP, not to future planned networks. Sept. 30 Hr'g Tr. vol. 4, at 29:6–30:5 (Ramirez).

- Ms. Zalkovsky called this statutory preference antiquated and of limited utility. Oct. 2 Hr'g Tr. vol. 9, at 46:21–47:5, 47:6–12, 47:19–48:4 (Zalkovsky).

- The RFP neither defined the word "preference" nor explained how mandatory preferences would be applied; indeed, Ms. Molina acknowledged that "the word 'preference' is not in the RFP." Sept. 30 Hr'g Tr. vol. 2, at 35:16–36:13 (Molina).

3

169393855.4

- Information about respondents' provider networks, *even information that HHSC had readily available*, was considered *only* if a respondent provided it in response to a Technical Question. Sept. 30 Hr'g Tr. vol. 4, at 37:17–23 (Ramirez).

- The responses to the RFP were not broken down by region and there was no scoring based on region. Sept. 30 Hr'g Tr. vol. 2, at 47:15–23 (Molina).

- The Technical Question relevant to section 533.003(a)(1) (No. 9) does not "directly ask any bidder to tell the agency about whether or not they have significant traditional providers in their networks." Oct. 1 Hr'g Tr. vol. 8, at 35:21–25 (Ramirez).

- The RFP does not otherwise ask respondents about providers in their networks who traditionally provide care to Medicaid and charity care patients. Sept. 30 Hr'g Tr. vol. 2, at 45:24–46:11 (Molina).

- The RFP respondents were directed to respond only to the Technical Questions and not provide any other materials. Sept. 30 Hr'g Tr. vol. 2, at 34:22–35:2 (Molina). Texas Children's representative Michael Murphy confirmed that Texas Children's interpreted the Technical Questions as requesting specific information that should be provided and noted that in other states, a respondent might be penalized for offering information beyond the call of the Technical Question. Oct. 4 Hr'g Tr. (Murphy).

- Evaluators were not trained on or asked to score the section 533.003(a)(1) preference. Sept. 30 Hr'g Tr. vol. 2, at 38:21–39:2, 39:13–15 (Molina).

- Nothing in the evaluator training materials, the sole training provided to evaluators, instructed evaluators "to give any of the statutory preferences or considerations at issue in this case." Sept. 30 Hr'g Tr. vol. 4, at 36:8–14, 40:5–15 (Ramirez); *see also* Sept. 30 Hr'g Tr. vol. 2, at 39:13–15 (Molina) (agreeing that "there was no discussion of preference whatsoever with the evaluators").

- Ms. Molina confirmed that the STAR & CHIP RFP does not "appl[y] preference" under section 533.003(a)(1) in the "ordinary meaning" of "choosing one thing over another." Sept. 30 Hr'g Tr. vol. 2, at 43:11–18 (Molina).

- Ms. Molina could not tell whether any Plaintiff has received a preference under section 533.003(a)(1). Sept. 30 Hr'g Tr. vol. 2, at 50:4–7 (Molina).

- Ms. Zalkovsky admitted that she has no direct knowledge of any respondent receiving the section 533.003(a)(1) preference based on information provided about provider networks. Oct. 2 Hr'g Tr. vol. 9, at 46:18–20, 77:6–15 (Zalkovsky).



169393855.4

- Mr. Ramirez claimed that the "only way the preference was given" is through a baked-in preference in the "graduated nonlinear scoring approach" used to score Technical Question No. 9, Sept. 30 Hr'g Tr. vol. 4, at 50:9–13, 52:11–15 (Ramirez), but this scoring methodology merely penalizes low-performing plans rather than reflecting a preference, *id.* at 51:18–52:4; is used for *all* Technical Questions, not only Technical Question No. 9, *id.* at 54:8–12; and gives respondents preferential scores even if they do *not* include Medicaid and charity care providers in their networks, *id.* at 57:25–58:19.

- Based on Mr. Ramirez's interpretation of the final scores, all eighteen respondents received the preference required by section 533.003(a)(1). Sept. 30 Hr'g Tr. vol. 4, at 47:1–4 (Ramirez).

- One respondent, Humana, received a "perfect score" on Technical Question No. 9 even though it did not describe in its proposal whether providers in its network have traditionally provided Medicaid and charity care. Sept. 30 Hr'g Tr. vol. 4, at 57:25–58:19 (Ramirez); *see also* Oct. 1 Hr'g Tr. vol. 8, at 42:10–13 (Ramirez) (conceding that he does not know if new entrants Humana and Bayou Health have "similarly extensive networks as plans that were already operating in Texas").

- Another respondent, Blue Cross and Blue Shield of Texas, received a perfect score on Technical Question No. 9 even though they have *no* federally qualified health centers in the Hidalgo Service Area, and federally qualified health centers are traditional providers of Medicaid and charity care in that service area. Oct. 2 Hr'g Tr. vol. 4, at 110:9–22 (Sanders); P-283; *see also* Sept. 30 Hr'g Tr. vol. 4, at 29:23–30:5 (Ramirez) (acknowledging that section 533.003(a)(1) addresses provider networks by region (i.e., service area)).

- The only document that reflects the support for a respondent's score and thus whether a respondent received a preference in scoring under section 533.003(a)(1) is HHSC's consensus scoring rubric, Oct. 1 Hr'g Tr. vol. 8, at 29:10–22 (Ramirez), but there is no evidence that any consensus scoring rubric reflects a higher score based on that preference.

☐ **No Preference for Quality of Care or Cost-Efficiency Benchmarks.** Defendant is failing to "give preference to an organization that offers a managed care plan that successfully implements quality initiatives . . . or meets quality of care and cost-efficiency benchmarks" as required by Texas Government Code section 536.052(d).

- Ms. Molina and Mr. Ramirez acknowledged that Texas law requires HHSC to give preference in the RFP to respondents who meet quality of care or cost-efficiency benchmarks. Sept. 30 Hr'g Tr. vol. 3, at 52:11–14 (Molina); Sept. 30 Hr'g Tr. vol. 4, at 30:11–25 (Ramirez).

5

- Mr. Ramirez confirmed that HHSC has not developed quality of care or cost-efficiency benchmarks that can be used in procurements. Oct. 1 Hr'g Tr. vol. 5, at 42:25–43:16 (Ramirez); *see also* Oct. 4 Hr'g Tr. (Thompson) (confirming same).

- Defendant did not consider benchmarks under section 536.052(d) as part of the RFP and has no plans to utilize benchmarks in the future to reassess the results of the RFP. Sept. 30 Hr'g Tr. vol. 2, at 51:9–17 (Molina); Sept. 30 Hr'g Tr. vol. 3, at 83:21–23 (Molina); Sept. 30 Hr'g Tr. vol. 4, at 31:1–5 (Ramirez); Oct.1 Hr'g Tr. vol. 5, at 43:17–20 (Ramirez).

- Mr. Ramirez contends that HHSC is permitted under section 536.052 to give preference to respondents who "successfully implement quality initiatives" in lieu of giving preference to respondents who have met quality of care or cost-efficiency benchmarks. Sept. 30 Hr'g Tr. vol. 4, at 31:6–10 (Ramirez).

- Mr. Ramirez admitted that the preference for implementation of quality initiatives under section 536.052(d) applies to *existing or prior* quality initiatives, not future initiatives. Sept. 30 Hr'g Tr. vol. 4, at 31:11–32:1 (Ramirez).

- The relevant Technical Questions (Nos. 12–15) do not request corresponding data or evidence related to successful implementation of quality initiatives. Sept. 30 Hr'g Tr. vol. 2, at 52:25–53:6 (Molina).

- The page limit for Technical Question No. 13 was ten pages, even though the referenced section of the Statement of Work on quality was fourteen pages long. Oct. 2 Hr'g Tr. vol. 9, at 15:17–16:4 (Ramirez).

- Ms. Molina conceded that she cannot tell if any Plaintiff has received a preference under section 536.052(d). Sept. 30 Hr'g Tr. vol. 2, at 55:8–17 (Molina).

- Ms. Zalkovsky admitted that she has no direct knowledge of any respondent receiving the section 536.052(d) preference based on information provided about quality initiatives. Oct. 2 Hr'g Tr. vol. 9, at 46:18–20, 77:16–22 (Zalkovsky).

- All eighteen respondents received scores of three or above on Technical Questions Nos. 12–15, the questions that corresponded to quality. Sept. 30 Hr'g Tr. vol. 4, at 47:8–13 (Ramirez); P-198.

- Nothing in the evaluator training materials instructed evaluators "to give any of the statutory preferences or considerations at issue in this case." Sept. 30 Hr'g Tr. vol. 4, at 36:8–14 (Ramirez).

- Evaluators were not instructed on the section 536.052(d) preference. Sept. 30 Hr'g Tr. vol. 2, at 38:21–39:2, 39:13–15 (Molina).

169393855.4

6

- Evaluators were instructed to consider only the materials provided by the respondents and did not verify whether any assertions about quality were true. Sept. 30 Hr'g Tr. vol. 2, at 53:14–20 (Molina); Sept. 30 Hr'g Tr. vol. 2, at 33:12–24 (Molina); Oct. 1 Hr'g Tr. vol. 5, at 39:13–24 (Ramirez).

- Evaluators did not consider the extensive quality data HHSC has about respondents. Sept. 30 Hr'g Tr. vol. 4, at 37:13–16, 38:12–15 (Ramirez) (agreeing that "the agency did not consider any . . . data in this procurement unless it was provided in response to one of the questions").

- Molina scored highest in the STAR & CHIP RFP even though, by HHSC's own estimation, it scores in the lower ranges on the agency's quality data and "does not meet quality of care measure minimum performance standards in any of the programs it operates in." Sept. 30 Hr'g Tr. vol. 4, at 69:2–18 (Ramirez); P-69. Indeed, when Molina's value-based enrollment metrics are compared to Texas Children's in the three Service Areas ("SAs") that Texas Children's currently serves, Molina has the *lowest* autoenrollments of all plans in those SAs while Texas Children's has the highest and is slated to lose all its membership in those SAs under the intended contract awards. Oct. 4 Hr'g Tr. (Murphy); *see also* Oct. 4 Hr'g Tr. (Thompson) (confirming that Molina scores low on statewide on quality metrics, along with BCBS of Texas and Aetna—which were all among the highest ranking MCOs in the procurement).

- The only document that reflects the support for a respondent's score and thus whether a respondent received a preference in scoring pursuant to section 536.052(d) is HHSC's consensus scoring rubric, Oct. 1 Hr'g Tr. vol. 8, at 29:10–22 (Ramirez), but there is no evidence that any consensus scoring rubric reflects a higher score based on that preference.

- HHSC attempted to obfuscate from the Legislature issues in this procurement, including the fact that HHSC did not consider quality metrics in the STAR & CHIP procurement. Oct. 1 Hr'g Tr. vol. 8, at 35:20–36:10 (Zalkovsky); P-299.

☐ **No Consideration or Documentation of Past Performance.** Defendant is failing to "consider" and "document . . . past vendor performance" as required by Texas Government Code section 2155.144(c) and (d).

- Ms. Molina acknowledged that Texas law requires consideration and documentation of past performance. Sept. 30 Hr'g Tr. vol. 3, at 52:5–10 (Molina); Sept. 30 Hr'g Tr. vol. 3, at 55:19–23 (Molina).

- Mr. Ramirez agreed that HHSC considered past performance to be a relevant factor under section 2155.144 in the STAR & CHIP RFP. Sept. 30 Hr'g Tr. vol. 4, at 33:16–19 (Ramirez):

7

169393855.4

> Q. Let me just ask you: Is past performance relevant to the STAR and CHIP procurement or not?
>
> A. Yes.

- Mr. Ramirez agreed that HHSC is therefore required to document that it considered past performance as part of the RFP. Sept. 30 Hr'g Tr. vol. 4, at 34:14–17 (Ramirez).

- Mr. Ramirez admitted that past performance "was not an express and independent consideration in this procurement"; that "there is no specific documentation showing the agency's consideration of relevant factors including past performance"; and that "the agency did not require the submission of past vendor performance." Sept. 30 Hr'g Tr. vol. 4, at 34:18–35:3 (Ramirez).

- Ms. Molina conceded that "the words 'past performance' are [not] going to show up anywhere" in any evaluations of respondents' proposals. Sept. 30 Hr'g Tr. vol. 2, at 60:22–61:3 (Molina).

- Ms. Zalkovsky admitted that she has no direct knowledge of any respondent receiving preference based on information provided about past performance. Oct. 2 Hr'g Tr. vol. 9, at 46:18–20, 77:25–78:3 (Zalkovsky).

- Evaluators were instructed to consider how respondents would perform *in the future* and did not "document anything about what [respondents] have done in the past or are presently doing." Sept. 30 Hr'g Tr. vol. 4, at 37:9–16 (Ramirez).

- Nothing in the evaluator training materials instructed evaluators "to give any of the statutory preferences or considerations at issue in this case." Sept. 30 Hr'g Tr. vol. 4, at 36:8–14 (Ramirez).

- HHSC rejected Mercer's recommendation to include past performance as a separate category with independent scoring weight. Sept. 30 Hr'g Tr. vol. 3, at 67:3–8 (Molina); P-114.003.

**Recommendations Not Implemented**
- Use of past performance as a separate evaluation category.
- Regional questions and separate scores by service area.

Commented [R(2): Not sure if we want to include this

- HHSC did not inform Defendant that Mercer's recommendation to include past performance as a separate evaluation criterion was not implemented. Oct. 1 Hr'g Tr. vol. 7, at 28:12–21 (Young); P-116.

- HHSC had considered past performance during previous STAR & CHIP procurements. Sept. 30 Hr'g Tr. vol. 4, at 62:17–63:2 (Ramirez).

8

- During the 2018 procurement, past performance was weighted 24% during proposal evaluation. P-018.158.

> 2. 24% - Indicators of probable vendor performance, including:
>    a. Respondent's past performance in Texas or comparable experience in other states, including proven ability to integrate physical and BH Services;

- During the 2011 procurement, past performance was expressly listed in the proposal evaluation criteria. P-017.002.

> **5.2     Evaluation Criteria**
>
> HHSC will evaluate proposals based on the following best value criteria, listed in order of precedence:
>
> 1. The extent to which the Respondent's proposal demonstrates an ability to accomplish the missions and objectives for this procurement, including:
>
>    a. the extent to which the proposal meets HHSC's needs, and the MCO Program clients' needs for high quality and accessible medical care;
>    b. The degree to which the proposal demonstrates program innovation, adaptability, and exceptional customer service; and
>    c. the extent to which the Respondent accepts without reservation or exception the RFP's terms and conditions, including **Attachment A**, "Uniform Managed Care Contract Terms and Conditions."
>
> 2. Indicators of probable performance under the Contract, including past performance in Texas or comparable experience; financial resources and solvency, including the impact on the Respondent's and its Subcontractors' ability to perform, and relevant organizational experience.

- Mr. Ramirez conceded that it was neither unfair nor unlawful for HHSC to consider past performance as part of prior STAR & CHIP procurements. Oct. 1 Hr'g Tr. vol. 6, at 44:6–47:17 (Ramirez).

- Superior's quality analysis shows that, in eleven of the thirteen service areas, the highest-ranking plan (or the plan tied for the highest ranking) will be eliminated from STAR & CHIP. Oct. 2 Hr'g Tr. vol. 9, at 102:11–23 (Sanders).

- Texas Children's representative Michael Murphy also confirmed that Molina, for example, which has the lowest percentage of autoenrollments of any of the plans in the SAs that Texas Children's serves, finished first in the procurement; in contrast, Texas Children's is slated to lose its entire membership despite having the highest percentage of autoenrollments for all the SAs it serves. Oct. 4 Hr'g Tr. (Murphy).



169393855.4

9

☐ **No Promotion of Continuity of Care or Reduction of Administrative and Nonfinancial Barriers.** Defendant is failing to "promot[e] continuity of care" and "reduce[] administrative and other nonfinancial barriers for recipients in obtaining health care services" as required by Texas Government Code section 533.002.

- Ms. Molina confirmed that "there was an affirmative decision by HHSC not to look at the displacement of STAR and CHIP members in making the intended contract awards." Sept. 30 Hr'g Tr. vol. 2, at 32:6–9 (Molina); *see also* Sept. 30 Hr'g Tr. vol. 3, at 76:4–25 (Molina) ("[W]e did not consider the numbers. We considered just what was in the responses in that in awarding the contract. So we did not look at numbers."); Oct. 1 Hr'g Tr. vol. 6, at 29:22–30:1 (Ramirez) ("[Q.] Did HHSC consider the transition of hundreds of thousands if not over a million of Texans when evaluating the proposals? A. No.").

- Mr. Ramirez acknowledged that "continuity of care was not a major factor in the scoring process for this procurement." Oct. 1 Hr'g Tr. vol. 6, at 14:16–25 (Ramirez).

- HHSC did not verify respondents' assertions that continuity of care would not be impacted by the contract awards. Oct. 1 Hr'g Tr. vol. 6, at 15:1–14 (Ramirez).

- HHSC realized that its intended STAR & CHIP contracts could require over 1.5 beneficiaries to change health plans. Oct. 2 Hr'g Tr. vol. 9, at 36:15–18 (Zalkovsky).

- Mr. Ramirez conceded that the delivery of healthcare to beneficiaries can become less stable if they are required to switch plans and providers. Oct. 1 Hr'g Tr. vol. 8, at 51:1–52:1 (Ramirez).

- Texas Children's witness Ashley Simms testified that there are numerous roles unique to each health plan, including care coordinators, school advocates, medication management teams, behavioral health teams, disease management teams, and maternal health teams, that build individual relationships with each member and all help that member navigate the healthcare system. Changing health plans would force the member to sever each of these relationships and start all over with their new health plan. Oct. 4 Hr'g Tr. (Simms).



10

- Ms. Simms also confirmed that the continuity of care provisions that would be in place in the resulting contracts do not help those members that are not currently in active treatment; if a member is on a health plan's waitlist for a needed assessment, a change in health plans would require that member to go to the back of the line in getting that assessment once the member has switched plans. Oct. 4 Hr'g Tr. (Simms). This has serious implications for, as an example, autistic members receiving ABA therapy, who benefit the most from intervention during a specific two-year window, ages 3 to 5, but who face a waitlist of more than a year to get the needed assessment for the therapy; if the member is required to switch plans before getting that intervention, they may have missed that peak window for treatment. Oct. 4 Hr'g Tr. (Simms).

- If the STAR & CHIP contracts are awarded as announced, approximately 1.8 million Texans will be forced to switch health plans, and many will also have to find new healthcare providers. Oct. 2 Hr'g. Tr. vol. 9, at 36:15–18, 37:6–18 (Zalkovsky); Oct. 2 Hr'g Tr. vol. 9, at 102:2–7 (Sanders).

☐ **"Mandatory" CHIP Contracts.** Defendant is violating Texas Government Code sections 2155.44 and 533.004 and Texas Health & Safety Code section 62.155 by awarding "mandatory" CHIP contracts.[1]

- Ms. Molina and Mr. Ramirez both agreed that the mandatory contract statute, section 533.004, does not apply to CHIP contracts because that statute applies only to Medicaid contracts (and CHIP is not Medicaid). Sept. 30 Hr'g Tr. vol. 2, at 61:10–17 (Molina); Oct. 1 Hr'g Tr. vol. 5, at 49:3–12 (Ramirez).

- HHSC considered an amendment to the RFP—in response to a pre-proposal challenge by Wellpoint—that would have specified that "mandatory" contracts would not be awarded for CHIP services and that CHIP contracts would be awarded based on respondents' scores, but HHSC elected not to make the amendment. Sept. 30 Hr'g Tr. vol. 2, at 66:3–67:11 (Molina); P-266.

- Ms. Molina testified that HHSC instead decided that it could award CHIP contracts to managed care organizations ("MCOs") receiving a mandatory Medicaid (STAR) contract using a "preference" allegedly set forth in subsection 62.155(c)(1). Sept. 30 Hr'g Tr. vol. 2, at 68:13–16 (Molina).

- Ms. Molina admits that HHSC treated the preference purportedly found in section 62.155(c) differently than the preferences in sections 533.003 and 536.052— meaning that, in the case of section 62.155(c)(1) only, HHSC used the preference to choose one type of respondent over another. Sept. 30 Hr'g Tr. vol. 2, at 68:1–8 (Molina).

---

[1] Cook Children's does not assert this claim and does not join in this argument.

11

169393855.4

- Ms. Molina admitted that all of the respondents to the RFP were required to provide similar coverage under the Medicaid program, Sept. 30 Hr'g Tr. vol. 2, at 69:9–12 (Molina), and she admitted that section 62.155 does not say anything about whether HHSC may give a preference for a respondent that qualifies for a mandatory contract under section 533.004, *id.* at 69:13–16.

- Mr. Ramirez conceded that, while mandatory CHIP contracts resulted from the "preference" described in section 62.155(c)(1), this preference was not reflected in respondents' final weighted scores. Oct. 2 Hr'g Tr. vol. 9, at 10:2–15 (Ramirez).

- Defendant testified that the mandatory contract awards resulted in "automatic" awards of both Medicaid and CHIP contracts to qualifying respondents, regardless of their scoring. Oct. 1 Hr'g Tr. vol. 7, at 46:3–13 (Young).

- Mr. Ramirez admitted that the lowest-scoring respondent received a mandatory contract for both STAR and CHIP services. Oct. 1 Hr'g Tr. vol. 5, at 58:4–24 (Ramirez).

☐ **Mandatory STAR Contracts.** Defendant is violating Texas Government Code section 533.004(a) by awarding mandatory STAR contracts without taking into consideration section 533.003.[2]

- HHSC does not consider any of the factors listed in section 533.003 when reviewing claims for mandatory STAR contract awards beyond requiring a respondent to submit a proposal and participate in Oral Presentation (i.e., the respondent's scores are not considered). Oct. 1 Hr'g Tr. vol. 5, at 45:3–47:21 (Ramirez).

☐ **No Consideration of Different Plans for Different Populations.** Defendant is failing to "consider the need to use different managed care plans to meet the needs of different populations" as required by Texas Government Code section 533.003(a)(3).

- Ms. Molina acknowledged that Texas law requires consideration of different managed care plans for different populations. Sept. 30 Hr'g Tr. vol. 3, at 52:19–22 (Molina).

- Mr. Ramirez admitted that this requirement applies to each procurement, including the STAR & CHIP RFP. Oct. 1 Hr'g Tr. vol. 8, at 30:20–32:1 (Ramirez)

- The RFP is conducted in a statewide manner that does not consider the needs of different populations within the State of Texas. Oct. 1 Hr'g Tr. vol. 5, at 63:10–64:7 (Ramirez); Oct. 1 Hr'g Tr. vol. 6, at 25:18–28:19 (Ramirez).

---

[2] Cook Children's does not assert this claim and does not join in this argument.

12

- Evaluators were not informed which service areas respondents are bidding on unless the respondents included that information in their responses to the Technical Questions. Oct. 1 Hr'g Tr. vol. 6, at 25:4–11 (Ramirez).

- Evaluators were not directed to consider service-area-by-service-area differences. Oct. 1 Hr'g Tr. vol. 8, at 37:6–18 (Ramirez).

☐ **Unlawful Disclosure.** Defendant disclosed other bidders' proposals to Aetna in violation of Texas law and basic procurement principles. *See* 1 Tex. Admin. Code § 391.101(2) (HHSC procurements must "provide for consistent and uniform management or procurement and contracting processes"); *id.* § 391.209(3)(A) (HHSC must utilize evaluation method that provides for "the fair consideration of proposals"; 34 Tex. Admin. Code § 20.208(d)(3) ("A state agency may not disclose information derived from proposals or discussions with a respondent to any competing respondent prior to award or cancellation of the solicitation.").

- Defendant erroneously disclosed other bidders' proposals to counsel for Aetna in August 2023, before Aetna's Oral Presentation. Sept. 30 Hr'g Tr. vol. 3, at 26:14–21 (Molina).

- Oral Presentations were scored elements of the RFP. Sept. 30 Hr'g Tr. vol. 3, at 26:3–5 (Molina).

- HHSC does not know what Aetna used in preparing its Oral Presentation. Sept. 30 Hr'g Tr. vol. 3, at 27:11–17 (Molina); Sept. 30 Hr'g Tr. vol. 3, at 33:19–25 (Molina).

- HHSC does not know what Aetna's counsel did with the redacted proposals that were erroneously disclosed by HHSC. Sept. 30 Hr'g Tr. vol. 3, at 25:14–16 (Molina).

- HHSC did not make the untimely disclosed proposals available to respondents other than Aetna. Sept. 30 Hr'g Tr. vol. 3, at 27:18–22 (Molina).

- Ms. Molina acknowledged that she does not know if the RFP scoring would have changed if Aetna had not received the untimely disclosure. Sept. 30 Hr'g Tr. vol. 3, at 35:13–17 (Molina).

- Wellpoint representative Greg Thompson testified that the information included in Wellpoint's redacted proposal would have aided a competitor in the oral presentations, particularly on the topic of oversight and coordination with subcontractors. Wellpoint's oral presentation on that topic was "almost word for word" what Wellpoint had presented in its proposal on the use of material subcontractors and was not redacted in the proposal that HHSC prematurely disclosed. Oct. 4 Hr'g Tr. (Thompson).

13

169393855.4

- Government procurement expert Judge Jeri Somers testified that the release of the proposals—even redacted versions of those proposals—during the procurement to only one bidder destroyed any level playing field and compromised the integrity of the procurement. Oct. 1 Hr'g Tr. vol. 5, at 14:3–21, 15:13–16:6, 30:7–20 (Somers).

- State Senator Charles Perry texted Defendant, expressing concern about the proposal disclosure and recommending that HHSC take a new approach; HHSC did not follow Senator Perry's recommendation. Oct. 1 Hr'g Tr. vol. 7, at 57:12–25 (Young); P-294.002.

> Messages - Senator Perry
>
> Is this the missing peace or something procurement was trying to cover up
>
> Answers a lot of the questions
> And definitely a response not "transparent"
>
> Disappointed and a lot of explaining to do
>
> And my recommendation is any a reopen is the only way to do it by excluding Aetna
>
> U can't get the geannie back in the bottle
>
> Cp

☐ **No Evaluation and Certification.** Defendant is failing to "evaluate and certify that the organization is reasonably able to fulfill the terms of the [STAR] contract" as required by Texas Government Code section 533.0035(a) and to "ensure that the entity is available, prepared, and able to fulfill [its] obligations under the [CHIP] contract" as required by Texas Health & Safety Code section 62.051(e).

- HHSC's certification questions did not cover all of terms of the STAR contract. Sept. 30 Hr'g Tr. vol. 4, at 83:1–10 (Ramirez).

- HHSC did not verify the information that respondents provided in response to certification questions. Sept. 30 Hr'g Tr. vol. 4, at 81:7–16 (Ramirez); Oct. 2 Hr'g Tr. vol. 9, at 31:23–32:1 (Zalkovsky).

- HHSC did not review any of the data it had already generated about the performances and capabilities of current Texas Medicaid MCOs during the STAR & CHIP certification. Sept. 30 Hr'g Tr. vol. 4, at 83:11–16 (Ramirez).

14

169393855.4

- Evaluators were given an option to choose "Will meet the criteria by the Operational Start Date," which is not included in either the applicable statute or rule. Sept. 30 Hr'g Tr. vol. 4, at 71:2–72:17, 75:12–76:18 (Ramirez).

- HHSC's only evidence regarding its certification decision and reasoning consists of the check boxes following each certification question. Sept. 30 Hr'g Tr. vol. 4, at 79:19–80:19 (Ramirez).

- Bayou Health self-certified information that was not accurate. Sept. 30 Hr'g Tr. vol. 4, at 79:13–15 (Ramirez).

☐ **The STAR Kids RFP.** Defendant will continue to commit ultra vires acts in connection with Request for Proposals No. HHS0013071 (the "STAR Kids RFP").

- Mr. Ramirez testified that the STAR Kids RFP is being administered in the same way as the STAR & CHIP RFP, including the same methodology for purportedly implementing statutory preference. Oct. 1 Hr'g Tr. vol. 8, at 42:19–43:1 (Ramirez).

☐ **No Meaningful Bid Protest Process.** Defendant is violating Article I, Section 13 of the Texas Constitution; 1 Texas Administrative Code Chapter 391, Subchapter C; and the terms of the RFP by awarding STAR & CHIP contracts without providing Plaintiffs the meaningful bid protest procedure promised.

- Wellpoint submitted a specifications protest when the STAR & CHIP RFP was issued and before any proposals were submitted, which was denied as premature because HHSC believed that, until contracts were awarded, Wellpoint could not show any adverse effect. Sept. 30 Hr'g Tr. vol. 2, at 61:18–63:17 (Molina).

- All eight protests submitted after the Notice of Intent to Award were denied. Sept. 30 Hr'g Tr. vol. 3, at 35:18–23 (Molina).

- Even though HHSC was aware of three releases of redacted copies of proposals, it still withheld the same information from other Public Information Act requestors, including Plaintiffs, prior to the deadline for submitting bid protests. Sept. 30 Hr'g Tr. vol. 3, at 15:8–12, 31:24–32:6, 40:16–19 (Molina).

- Ms. Molina's stated reason for denial of the bid protests included a failure to establish that any violations of statute affected the integrity of the solicitation, even though she conceded that was not the standard in 1 Texas Administrative Code section 391.307(c). Sept. 30 Hr'g Tr. vol. 3, at 38:2–16 (Molina).

15

- Ms. Molina did not consider any of the supplemental protests submitted by Plaintiffs because they were not submitted within ten business days of the Notice of Intent to Award, even though they included information that was previously unavailable and 1 Texas Administrative Code section 391.307(d)(1) requires consideration if good cause is shown. Sept. 30 Hr'g Tr. vol. 3, at 38:17–40:19, 83:24–84:19 (Molina).

☐ **Lack of Knowledge of Defendant's Witnesses.** Additionally, hearing testimony repeatedly demonstrated that Defendant and other HHSC personnel lack knowledge of the STAR & CHIP RFP and the details of its administration—underscoring that the procurement process lacks the oversight and coordination needed to ensure that Defendant complies with mandatory statutory and regulatory requirements, and that Defendant has failed to advance a credible evidentiary defense in this matter.

- Ms. Molina acknowledged that she did not look at every response to the RFP. Sept. 30 Hr'g Tr. vol. 2, at 56:12 (Molina).

- Ms. Molina did not talk to any of the evaluators. Sept. 30 Hr'g Tr. vol. 3, at 37:11–14 (Molina).

- Mr. Ramirez was not an evaluator. Oct. 1 Hr'g Tr. vol. 6, at 24:25–25:3 (Ramirez).

- Mr. Ramirez did not read any of the evaluators' notes. Oct. 1 Hr'g Tr. vol. 6, at 24:7–8 (Ramirez).

- Mr. Ramirez did not participate in the consensus scoring meetings. Oct. 1 Hr'g Tr. vol. 6, at 24:9–11 (Ramirez).

- Mr. Ramirez admitted that he has not seen most of the consensus scoring rubrics; indeed, he only looked at one or two of them. Oct. 1 Hr'g Tr. vol. 8, at 29:20–22 (Ramirez).

- Mr. Ramirez acknowledged that he has not reviewed most of the proposals submitted in response to the RFP, Oct. 1 Hr'g Tr. vol. 8, at 30:1–3 (Ramirez). (Ramirez); indeed, Mr. Ramirez admitted that he has only reviewed a few of the bidders' submissions, Oct. 1 Hr'g Tr. vol. 7, at 66:7–9 (Ramirez).

- Mr. Ramirez cannot say what all or even most bidders included in their proposals. Oct. 1 Hr'g Tr. vol. 8, at 30:4–9 (Ramirez).

- Mr. Ramirez testified that he does not know whether information from responses to the Technical Questions were reviewed in the certification process. Sept. 30 Hr'g Tr. vol. 4, at 82:22–25 (Ramirez).

16

- Ms. Zalkovsky did not look at the proposals or the scoring and does not have direct knowledge of the scoring of each individual bidder's response. Oct. 2 Hr'g Tr. vol. 9, at 46:10–17 (Zalkovsky); *see also id.* at 27:10–11 (Zalkovsky) ("I did not personally score any of the responses or see the score sheets[.]").

## II.  DEFENDANT'S "INJURY"

Defendant's testimony undercuts the only injury she claimed in opposing Plaintiffs' requests for a temporary injunction: that "[h]alting a state Medicaid program would be extremely disruptive to the current timeline that was carefully thought out to transition and protect continuity of care." Def.'s Plea to Jurisdiction & Resp. to Pls.' Reqs. for Temporary Inj. 42–43. Specifically, Defendant testified that, given the "very robust readiness requirement," the intended September 2025 start date for the new STAR & CHIP contracts "is no longer operative, is—is on pause." Oct. 1 Hr'g Tr. vol. 7, at 19:9–20 (Young). Given that the "current timeline" has already been discarded, Plaintiffs' requested injunction would not injure either Defendant or HHSC. *See Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 576 (Tex. App.—Austin 2000, no pet.) (courts "balance[] the equities of the parties and the resulting conveniences and hardships" when awarding injunctive relief).

Moreover, Ms. Molina acknowledged that, if the results of the STAR & CHIP RFP were cancelled, HHSC could extend the current STAR & CHIP contracts to ensure coverage and services for members—just as it did when prior procurements were cancelled. Sept. 30 Hr'g Tr. vol. 3, at 67:9–24 (Molina). This was further confirmed by Wellpoint representative Greg Thompson, who says the current plans are already technically operating under bridge contracts with HHSC. Oct. 4 Hr'g Tr. (Thompson).

## III.  IRREPARABLE HARM

An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor*

17

169393855.4

*Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *see also Cardinal Health Staffing Network Inc. v. Bowen*, 106 S.W.3d 230, 235 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("An adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief.").

Superior's corporate representative, Mark Sanders, testified that approximately 700,000 of the 800,000 STAR & CHIP members currently served by Superior will be forced to change their health plans. Oct. 2 Hr'g Tr. vol. 9, at 99:15–18, 102:4–10 (Sanders). Although services under the new contracts were not slated to begin until September 1, 2025, Superior already faces the prospect of losing employees due to concerns about Superior's significant loss in membership under the proposed contracts and poaching by rival MCOs, endangering Superior's operations under its existing contracts with HHSC and its reputation. *Id.* at 111:14–112:21, 113:1–17. Mr. Sanders testified that Superior has heard reports that some providers are already informing members that Superior will no longer be providing STAR & CHIP services in certain areas and are encouraging members to switch plans even now. *Id.* at 114:21–115:5. Mr. Sanders also testified to Superior's difficulties retaining its existing, robust provider network, as providers will be less likely to negotiate renewals of their contracts with Superior, and that those renewal negotiations are occurring now. *Id.* at 113:18–114:4. Superior would also lose its investments in value-based partnerships, causing further reputational harm. *Id.* at 114:5–20. Moreover, HHSC has previously taken the legal position that once contracts are signed those contracts are final and there is no legal remedy available to the health pans, even if the procurement was unlawful. *Id.* at 115:11–116:8.

Texas Children's corporate representative, Michael Murphy, testified that 75% of Texas Children's revenues come from serving the STAR & CHIP programs, meaning that the intended contract awards, if executed, threaten Texas Children's very existence and virtually all of its

18

employees' jobs. Further, the intended contract awards announced by HHSC will result in all of Texas Children's 420,000 STAR & CHIP members being forced to change their health plans, impacting access to care. Texas Children's participation in the STAR Kids program is also at risk because the larger STAR & CHIP contracts are needed to provide economies of scale to limit losses from STAR Kids. Oct. 4 Hr'g Tr. (Murphy).

Wellpoint's corporate representative, Greg Thompson, testified that the intended contract awards, if executed, jeopardize the jobs of many of its employees and its ongoing operations. Mr. Thompson observed that in the prior STAR+PLUS procurement, MCOs entering the market or expanding their business began poaching employees from other MCOs that were losing business a year before the new STAR+PLUS contracts became operational. Mr. Thompson testified that Wellpoint has already lost associates who have moved on to different health plans. If executed, the intended contract awards also mean that 380,000 of Wellpoint's members will lose access to long-standing, trusted providers and unique community services, like Wellpoint's doula program. Wellpoint has also made significant investments—"hundreds of millions of dollars"—in improving health quality outcomes in the SAs it serves, and the intended contract awards if implemented will mean those investments will not be realized. Oct. 4 Hr'g Tr. (Thompson).

Cook Children's corporate representative, Karen Love, testified that the intended contract awards represent an existential threat to the plan. Cook Children's is the Tarrant SA's only home-grown integrated MCO, and Cook Children's has spent more than 20 years building a robust provider network on which its members rely. Cook Children's participation in the STAR Kids program is also in jeopardy because the larger STAR & CHIP contracts are needed to provide economies of scale to limit losses from STAR Kids. The intended contract awards, if executed, will force Cook Children's approximately 115,000 STAR & CHIP members and 8,000 STAR Kids

19

169393855.4

members to switch to health plans that are not integrated health plans, like Cook Children's. Oct. 4 Hr'g Tr. (Love).

Thus, each Plaintiff has offered substantial evidence that it will suffer irreparable harm to itself, its employees, and its STAR & CHIP members if the Court does not order immediate relief and enjoin Defendant's further *ultra vires* acts.



169393855.4

20

Respectfully submitted,

By: */s/Karen C. Burgess*

Karen C. Burgess
State Bar No. 00796276
Email: kburgess@burgesslawpc.com
Katie Dolan-Galaviz
State Bar No. 24069620
Email: kgalaviz@burgesslawpc.com
**BURGESS LAW PC**
404 West 13th Street
Austin, Texas 78701-1825
Telephone: (512) 482-8808

Matthew P. Gordon
Admitted Pro Hac Vice
Email: mgordon@perkinscoie.com
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: (206) 359.8000

**ATTORNEYS FOR PLAINTIFF COOK CHILDREN'S HEALTH PLAN**



169393855.4

21

**HOLLAND & KNIGHT LLP**

*/s/Meghan J. McCaig* (with permission)
Karen D. Walker
*Admitted Pro Hac Vice*
Florida Bar No. 982921
District of Columbia Bar No. 90004390
karen.walker@hklaw.com
Tiffany Roddenberry
*Admitted Pro Hac Vice*
Florida Bar No. 92524
tiffany.roddenberry@hklaw.com
315 S. Calhoun Street, Suite 600
Tallahassee, Florida 32301
(850) 425-5612 (telephone)
(850) 224-8832 (facsimile)

Theresa Wanat
Texas Bar No. 24071469
theresa.wanat@hklaw.com
811 Main Street, Suite 2500
Houston, Texas 77002
(713) 821-7000 (telephone)
(713) 821-7001 (facsimile)

J. Meghan McCaig
Texas Bar No. 24070083
meghan.mccaig@hklaw.com
One Arts Plaza
1722 Routh Street, Suite 15500
Dallas, Texas 75201
(214) 964-9500 (telephone)
(214) 964-9501 (facsimile)

James E. Cousar
Texas Bar No. 04898700
james.cousar@hklaw.com
98 San Jacinto Blvd
Austin, Texas 78701
(512) 469-6112 (telephone)
(512) 469-6180 (facsimile

**ATTORNEYS FOR PLAINTIFF SUPERIOR HEALTHPLAN, INC.**



169393855.4

22

**NORTON ROSE FULBRIGHT US LLP**

*/s/Paul Trahan* (with permission)
Susan Feigin Harris
Texas State Bar No. 06876980
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5377
Facsimile: (713) 651-5246

Paul Trahan
Texas State Bar No. 24003075
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

Thomas A. Coulter
Texas State Bar No. 04885500
799 9th Street, NW, Suite 1000
Washington, D.C. 20001
Tel: (202) 662-4765
Fax: (202) 662-4643

Jeff J. Wurzburg
Texas State Bar No. 24105140
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 270-9338
Facsimile: (210) 270-7205

**ATTORNEYS FOR PLAINTIFF
TEXAS CHILDREN'S HEALTH PLAN**



169393855.4

23

**FOLEY & LARDNER LLP**

*/s/ Robert F. Johnson III* (with permission)
Robert F. Johnson III
Texas State Bar No. 10786400
rjohnson@foley.com
600 Congress Avenue, Suite 3000
Austin, TX 78701
Tel: 512.542.7127
Fax: 512.542.7100

Michelle Y. Ku
Texas Bar No. 24071452
mku@foley.com
Brantley A. Smith
Texas Bar No. 24110375
bsmith@foley.com
2021 McKinney, Suite 1600
Dallas, Texas 75201
Tel: 214.999.3000
Fax: 214.999.4667

Benjamin J. Grossman
Admitted Pro Hac Vice
Florida Bar No. 92426
bjgrossman@foley.com
106 E. College Ave., Suite 900
Tallahassee, Florida 32301
Tel: 850.222.6100
Fax: 850.561.6475

**ATTORNEYS FOR PLAINTIFF
WELLPOINT INSURANCE COMPANY**



169393855.4

24

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served on all counsel by the Court's e-filing on this 4th day of October, 2024.

_/s/Karen C. Burgess_



169393855.4

25

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 106224120
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Aetna's Appellant's Brief
Status as of 9/30/2025 7:04 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michaelle Peters | | mpeters@scottdoug.com | 9/29/2025 4:59:42 PM | SENT |
| Julie Wright | | julie.wright@nortonrosefulbright.com | 9/29/2025 4:59:42 PM | SENT |
| Amanda DoddsPrice | | amanda.price@squirepb.com | 9/29/2025 4:59:42 PM | SENT |
| Karen Burgess | 796276 | kburgess@burgesslawpc.com | 9/29/2025 4:59:42 PM | SENT |
| Mark Emery | 24050564 | mark.emery@nortonrosefulbright.com | 9/29/2025 4:59:42 PM | SENT |
| Robert Johnson | 10786400 | rjohnson@foley.com | 9/29/2025 4:59:42 PM | SENT |
| Richard Phillips | 24032833 | Rich.Phillips@hklaw.com | 9/29/2025 4:59:42 PM | SENT |
| J McCaig | 24070083 | meghan.mccaig@outlook.com | 9/29/2025 4:59:42 PM | SENT |
| Michelle Ku | 24071452 | mku@foley.com | 9/29/2025 4:59:42 PM | SENT |
| Joseph Knight | 11601275 | jknight@ebbklaw.com | 9/29/2025 4:59:42 PM | SENT |
| Amy Warr | 795708 | awarr@adjtlaw.com | 9/29/2025 4:59:42 PM | SENT |
| Warren Huang | 796788 | warren.huang@nortonrosefulbright.com | 9/29/2025 4:59:42 PM | SENT |
| Paul Trahan | 24003075 | paul.trahan@nortonrosefulbright.com | 9/29/2025 4:59:42 PM | SENT |
| Susan Harris | 6876980 | susan.harris@nortonrosefulbright.com | 9/29/2025 4:59:42 PM | SENT |
| Anna Baker | 791362 | abaker@adjtlaw.com | 9/29/2025 4:59:42 PM | SENT |
| Maria Williamson | | maria.williamson@oag.texas.gov | 9/29/2025 4:59:42 PM | SENT |
| Cory Scanlon | 24104599 | cory.scanlon@oag.texas.gov | 9/29/2025 4:59:42 PM | SENT |
| Mandy Patterson | | mpatterson@adjtlaw.com | 9/29/2025 4:59:42 PM | SENT |
| Michelle Joyner | | mjoyner@scottdoug.com | 9/29/2025 4:59:42 PM | SENT |
| William FCole | | William.Cole@oag.texas.gov | 9/29/2025 4:59:42 PM | SENT |
| Abril Rivera | | arivera@scottdoug.com | 9/29/2025 4:59:42 PM | SENT |
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 9/29/2025 4:59:42 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 106224120
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Aetna's Appellant's Brief
Status as of 9/30/2025 7:04 AM CST

Case Contacts

| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 9/29/2025 4:59:42 PM | SENT |
|---|---|---|---|---|
| Kayla Ahmed | | kayla.ahmed@nortonrosefulbright.com | 9/29/2025 4:59:42 PM | SENT |
| Kristin Hernandez | | kristin.hernandez@foley.com | 9/29/2025 4:59:42 PM | SENT |
| Thomas Coulter | 4885500 | tom.coulter@nortonrosefulbright.com | 9/29/2025 4:59:42 PM | SENT |
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 9/29/2025 4:59:42 PM | SENT |
| Cheryl LaFond | 24104015 | clafond@scottdoug.com | 9/29/2025 4:59:42 PM | SENT |
| Jessie Johnson | | jessie.johnson@nortonrosefulbright.com | 9/29/2025 4:59:42 PM | SENT |
| Benjamin Grossman | | bjgrossman@foley.com | 9/29/2025 4:59:42 PM | SENT |
| Cory Scanlon | | cory.scanlon@oag.texas.gov | 9/29/2025 4:59:42 PM | SENT |
| David Johns | | david@cobbjohns.com | 9/29/2025 4:59:42 PM | SENT |
| Jennifer Cook | | Jennifer.Cook@oag.texas.gov | 9/29/2025 4:59:42 PM | SENT |
| Juliana Bennington | | jbennington@perkinscoie.com | 9/29/2025 4:59:42 PM | SENT |
| Jonathan Hawley | | jhawley@perkinscoie.com | 9/29/2025 4:59:42 PM | ERROR |
| Trisha Marino | | tmarino@perkinscoie.com | 9/29/2025 4:59:42 PM | SENT |
| Katie Dolan-Galaviz | | kgalaviz@burgesslawpc.com | 9/29/2025 4:59:42 PM | SENT |
| Karen Walker | | karen.walker@hklaw.com | 9/29/2025 4:59:42 PM | SENT |
| Tiffany Roddenberry | | tiffany.roddenberry@hklaw.com | 9/29/2025 4:59:42 PM | SENT |
| Stacey Obenhaus | | sobenhaus@foley.com | 9/29/2025 4:59:42 PM | SENT |
| Jason R.LaFond | | jlafond@scottdoug.com | 9/29/2025 4:59:42 PM | SENT |
| Matthew Gordon | | mgordon@perkinscoie.com | 9/29/2025 4:59:42 PM | SENT |
| Jeffrey Stephens | | jeff.stephens@oag.texas.gov | 9/29/2025 4:59:42 PM | SENT |
| Stacey Jett | | sjett@adjltaw.com | 9/29/2025 4:59:42 PM | SENT |
| Perkins Docketing Team | | DocketSEA@perkinscoie.com | 9/29/2025 4:59:42 PM | SENT |